**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SEAN ARMIN,<br><br>　　Plaintiff and Appellant,<br><br>　　　v.<br><br>RIVERSIDE COMMUNITY HOSPITAL,<br><br>　　Defendants and Appellants;<br><br>MEDICAL STAFF OF RIVERSIDE<br>COMMUNITY HOSPITAL et al.,<br><br>　　Defendants and Respondents. | G052125<br><br>(Super. Ct. No. RIC1217004)<br><br>ORDER ON:  PETITION FOR<br>REHEARING; WITHDRAWAL<br>OF PETITION FOR REHEARING;<br>AND MOTION TO MODIFY THE<br>OPINION; ORDER MODIFYING<br>OPINION, NO CHANGE IN<br>JUDGMENT |

　　　　On November 18, 2016, the Fenton Law Group moved to modify the caption of our opinion filed November 16, 2016, to delete the reference to the law firm of Fenton Nelson, on the ground that when appellant Sean Armin's opening brief was filed, Fenton Nelson "had either already been dissolved, or was in the process of being dissolved."  We are unable to grant this request because the California Style Manual states, in section 5:15, that if a law firm has appeared for a client on appeal, it should be listed in the caption.  In the present case, Appellant's opening brief, filed March 19, 2014, was filed by Fenton Nelson, LLP.

On December 1, 2016, defendants Riverside Community Hospital and defendant and Medical Staff of Riverside Community Hospital (the Hospital) filed a petition for rehearing. However, on December 12, 2016, the attorneys for the various parties in the case, including the Hospital, Armin and the individual doctors, filed a notice of settlement. And on that same day, attorneys for the Hospital also filed a withdrawal of the request for rehearing. The Hospital's withdrawal request, however, states that the Hospital does not withdraw its "request made in the Petition for Rehearing that the identified sections of the Opinion be decertified for publication, or ordered depublished, for reasons stated in the Petition for Rehearing."

In its now withdrawn petition for rehearing the Hospital identifies an error on page 3 of the slip opinion, namely "FEHA" as the opinion now reads, should instead be "Unruh Civil Rights Act." Independent of the withdrawal of the petition, we hereby modify the slip opinion on page 3, second full paragraph, first sentence, to substitute the words "Unruh Civil Rights Act" for "FEHA."

That leaves the question of the Hospital's existing requests for decertification of "identified sections" of the opinion. The problem here is that the Hospital does not – at least not with precision – identify those parts of the slip opinion that might readily be excluded from an otherwise published opinion without directly affecting the judgment that Armin's Health and Safety Code section 1278.5 (section 1278.5) action against the Hospital might proceed as against the anti-SLAPP motion filed by the Hospital. The one part most easily separated from the balance of the opinion, part III.B., involving Armin's section 1278.5 claims against individual physicians and holding those individual physicians are immune from Armin's section 1278.5 claims, is not challenged in the December 1, 2016 petition for rehearing.

2

Functionally, then, it appears that the Hospital wants to maintain its petition for rehearing and withdraw it too. Most of the petition for rehearing consists not of a challenge to the main holding of the opinion – that administrative exhaustion of peer review proceedings is not a prerequisite to a section 1278.5 action – but rather consists of arguments that are fact-specific and peculiar to this now-settled action. Because these arguments are record-specific, we must conclude that by withdrawing its request for rehearing, these arguments are being waived.

However, the Hospital's petition has pointed out another area in which the opinion might be improved. In light of the Hospital's (now withdrawn) petition for rehearing, we hereby modify the opinion in the following particular:

On page 22 of the slip opinion, in the first paragraph of section 4, after the sentence ending with the words "whistleblowing claim is based on his December 2011 conversation with the hospital's COO in which he complained about Douglas and Clark's lackadaisical approach to urgent care" insert the following new footnote (and renumber the remaining footnotes accordingly):

"Under subdivision (i) of section 1278.5, a 'health care facility' – and that includes the Hospital here – is defined to include both 'the facility's administrative personnel' such as the hospital's COO here, and its 'medical staff.'" This modification does not affect the judgment.

                                        BEDSWORTH, ACTING P. J.
WE CONCUR:


IKOLA, J.


THOMPSON, J.


3

Filed 11/16/16; pub. order 11/17/16 (see end of opn.) (unmodified version)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SEAN ARMIN,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>RIVERSIDE COMMUNITY HOSPITAL,<br><br>  Defendants and Appellants;<br><br>MEDICAL STAFF OF RIVERSIDE<br>COMMUNITY HOSPITAL et al.,<br><br>  Defendants and Respondents. | G052125<br><br>(Super. Ct. No. RIC1217004)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Riverside County, Philip Argento, Judge.  (Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part and reversed in part with directions.

Fenton Nelson, John A. Mills and Farooq Mir; Fenton Law Group, Henry R. Fenton, Dennis E. Lee and Nicholas D. Jurkowitz for Plaintiff and Appellant.

Theodora Oringher, Todd C. Theodora and Suzanne Cate Jones for Defendant and Appellant Riverside Community Hospital, and Defendants and Respondents Medical Staff of Riverside Community Hospital, Kenneth E. Dozier and Subbu Nagappan.

Law Office of Mark T. Kawa and Mark T. Kawa for Defendants and Respondents Clifford Douglas and Lawrence Clark.

\*      \*      \*

## I. INTRODUCTION

We embark here upon an admittedly lengthy voyage – slow going because we must proceed carefully in largely uncharted waters. The appeal requires us to decide two questions of first impression regarding the interaction between (a) hospital peer review proceedings against doctors governed by sections 805 to 809.7 of the Business and Professions Code, and (b) the hospital whistleblower statute, Health and Safety Code section 1278.5.[1] The first question is one left open by our Supreme Court's decision in *Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655 (*Fahlen*). *Fahlen* squarely held that a physician could prosecute a section 1278.5 action without first having to prevail in an administrative mandate proceeding attacking a peer review determination, but the court did not go so far as to excuse the physician from completing the internal peer review process before filing a section 1278.5 action. The case before us now presents that very question: Is completion of peer review a prerequisite of a section 1278.5 action? Based on the analysis in *Fahlen* and the text and legislative history of section 1278.5, we hold that a physician need not complete the internal peer review process prior to filing a section 1278.5 action.

---

[1] All undesignated statutory references in this opinion are to the Health and Safety Code. All undesignated references to any subdivision of a statute are to section 1278.5 of that Code.

2

The second question is whether a physician bringing a section 1278.5 action may name as defendants individual physicians involved in the peer review process who allegedly instigated the process in retaliation for the physician's whistleblowing. Based on the text of section 1278.5 and its legislative history, we hold that a physician may *not* name individual physicians in a section 1278.5 complaint.

To complete the opinion, we must also decide an issue involving the tripartite interaction of the anti-SLAPP statute (Code Civ. Proc. § 425.16), the peer review process, and a physician's religious discrimination claims against a hospital under FEHA. The issue is whether the fact the physician reiterated complaints of religious discrimination by the hospital in the context of protesting the initiation of peer review proceedings against him so intertwined his discrimination claims with the peer review proceedings as to subject his discrimination claims to an anti-SLAPP motion. Here, because the physician first voiced his complaints of religious discrimination *prior* to the initiation of the peer review proceedings, it is clear his discrimination claims are not based on activity protected under the anti-SLAPP statute. The hospital's remedy if those religious discrimination claims cannot be supported by substantial evidence – or are otherwise legally infirm – is a summary judgment motion.[2]

---

[2] So that readers can have one place – this footnote – to check for the administrivia of party names and acronyms, we engage first in what poet Henry Reed would call "Naming of Parts." There are four sets of defendants listed in the caption of the complaint: (1) Riverside Community Hospital itself, more formally titled "Riverside Healthcare System, Inc."; (2) a group of professionals listed as the "Medical Staff of Riverside Community Hospital" and the complaint alleges is an "unincorporated association comprised of physicians and other licensed practitioners who provide professional services" at Riverside Community Hospital; (3) Kenneth Dozier and Subbu Nagappan, who are, respectively, the chair of the Medical Executive Committee of Riverside Community Hospital and the chair of the Surgical Quality Review Committee of Riverside Community Hospital; and (4) Clifford Douglas and Lawrence Clark, physicians who allegedly initiated the peer review proceeding which is at the heart of this appeal.

Unless the context otherwise requires, we will refer to all defendants collectively as "the hospital." When speaking of Riverside Community Hospital in particular, we will use the initials used by the parties, "RCH." Though Douglas and Clark, and Dozier and Nagappan filed their own respondent's briefs, when we speak or cite to the "respondent's brief" ("resp. br.") we refer to the brief of RCH, which has carried the laboring oar of the defendants' arguments on appeal. Douglas and Clark also operate their own entity, known as "Riverside Neurosurgical Associates," which the parties refer to by the initials RNA.

## II. FACTS

It is important to emphasize at the outset that this is *not* an administrative mandate case following an evidentiary hearing terminating a physician's hospital privileges. This is *not* a case where a physician is claiming that violations of fair procedure or lack of substantial evidence requires a court to set aside some hospital discipline taken after peer review proceedings. In such a case the standard of review would be highly favorable to the hospital. (See *Fahlen, supra,* 58 Cal.4th at p. 673.) But this case arrives here by way of an anti-SLAPP motion – sans evidentiary hearing. Accordingly, we resolve conflicts and inferences in the record in favor of the plaintiff. (*Barker v. Fox & Associates* (2015) 240 Cal.App.4th 333, 347-348.)

Here, the peer review process was not completed. If there is a spin to our statement of facts, it is because we must credit the plaintiff's evidence in opposition to the anti-SLAPP motion where it conflicts with that of the defendants. In such motions, "The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." (See *Baral v. Schnitt* (Aug. 1, 2016, S225090) ___ Cal.4th ___, ___ 2016 Cal.LEXIS 6383 Cal. 2016 at p. __ (*Baral*).)

---

Readers should note that in part III.B. of this opinion we must particularly differentiate "the hospital" and RCH from the individual doctors, Dozier, Nagappan, Douglas and Clark. When referring to the plaintiff's claims against doctors Dozier, Nagappan, Douglas and Clark individually, we will refer to them as the "four individual doctor defendants." Further, in the lexicon of hospital peer review disciplinary proceedings, "MEC" stands for "medical executive committee," "SQRC" for the "surgical quality review committee," and "JRC" for the "judicial review committee." The MEC and JRC acronyms are common in the case law in the area. (E.g., *Fahlen, supra*, 58 Cal.4th at p. 663; *Sadeghi v. Sharp Memorial Medical Center Chula Vista* (2013) 221 Cal.App.4th 598, 602, 608; *Michalski v. Scripps Mercy Hospital* (2013) 221 Cal.App.4th 1033, 1035.) SQRC, by contrast, makes its debut in this case.

And since we are already swimming in alphabet soup, a few more acronymic definitions are in order: "CHA" stands for the California Hospital Association, the hospitals' trade association which played a major – if ultimately losing – role in the legislative history leading up to section 1278.5, subdivision (h). "CMA" stands for the "California Medical Association," which is the doctors' trade association and the nemesis of the CHA in the 2007 effort to amend section 1278.5.

With that in mind, we set out the chronology of events leading to this appeal, which subdivides itself into four distinct phases:

(1) *2009-2010: Employment by RNA and work at RCH*: From August 2009 to October 2010, plaintiff Sean Armin, a Riverside brain surgeon, worked both as an employee of a firm, RNA, owned by two other brain surgeons, Douglas and Clark, and also had surgery privileges at RCH. Armin was recruited by RCH in order to beef up the area's neurosurgical care, with newer skills, especially as directed toward minimally invasive surgery. At RCH's behest, Armin took emloyment with RNA, run by Douglas and Clark, the area's only neurosurgeons at the time. But Douglas and Clark – according to Armin – were threatened by Armin's newer – and to them unfamiliar – skill set. They forbade him, for example, from using a technique known as "Deep Brain Stimulation" which, according to Armin, can be helpful in the treatment of Parkinson's disease.

It was during this first period that Douglas made several remarks perceived by Armin to be anti-Semitic slurs,[3] while Clark made it a point that he would not even try to accommodate Armin's desire for time off for Jewish religious holidays.[4] Perhaps the most dramatic instance of Clark's attitude toward any such accommodation was Clark's refusal to treat one of Armin's patients who came into the emergency room during Yom Kippur. Clark had the hospital's emergency department repeatedly page Armin, saying he was not "covering for" Armin. But Armin's pager was turned off that day in observance of Yom Kippur. The upshot was that the patient was left for Armin to treat for a suspected infection two days later.

(2) *2010-2012: Post-RNA Employment*: From October 2010, when Armin left RNA because Douglas and Clark attempted to cut his salary in half, to January 2012,

---

[3] Two stand out: According to Armin's declaration, in November 2009, Douglas referred to a certain Jewish anesthesiologist working at the hospital as the same "species" as Armin, and several months later in 2010 he said Armin should meet the anesthesiologist because "you Jews should just really stick with each other."

[4] According to Armin's declaration Clark told Armin: "Just because you're Jewish it doesn't mean you're special, you're an employee and you need to abide by our rules that come before you being Jewish."

Armin was no longer an employee of RNA. Armin started his own practice but continued to have hospital privileges at RCH. Douglas and Clark remained in control of the neurosurgery call panel at RCH and dropped him from the emergency call schedule, obviously cutting into his new business.

Armin complained to RCH's CEO in late 2010 and early 2011 about being dropped from the call schedule. He also informed the CEO that emergency room physicians and nurses had informed him Douglas and Clark "often refused to see patients in the middle of the night and postponed their evaluation of emergency room consults to the next day, thus hurting the quality of care provided at the hospital." Armin also told the CEO that it was against the law for the hospital "to give RNA the exclusive right to provide call coverage for the hospital's patients."[5] RCH responded by putting Armin on the call schedule, but only for three days in April of 2011 (the 22nd through the 24th) which just happened to fall during the middle of Passover. Armin again complained to the CEO (and several others in the hospital administration), but he was never placed on the call schedule again.

During this same period Clark demanded that Armin's access to the neurosurgical operating room on Mondays be terminated, so Clark could have the room for his own patients that day. The result was that Armin had to start operating on Fridays, which presented an obvious conflict in the event he wasn't finished by the beginning of the Sabbath on Friday night.[6] In late December 2011, Armin told RCH's COO that Douglas and Clark were transferring patients or sometimes just delaying treatment of those patients, and that in one instance the lack of timely treatment resulted in a patient becoming permanently blind.

---

[5]    Armin's theory is that since RCH participates in Medi-Cal, it is precluded, under Welfare and Institutions Code section 14087.28, to enter into any such exclusive contract.

[6]    Douglas and Clark, like Armin, have attended Loma Linda Medical School, a Seventh-Day Adventist institution. It is a reasonable inference that both of them knew a Friday operating schedule would often interfere with the observance of those who recognized a Saturday Sabbath.

(3) *Early 2012-Present*: *The initiation and continuation of Peer Review Proceedings*: On January 16, 2012 Douglas wrote to RCH's "Office of Performance Improvement" alleging three specific instances of malpractice on Armin's part. The surgeries had all occurred within the previous three weeks. Defendants Dozier and Nagappan were courtesy-copied on the letter.

Douglas' letter caused Nagappan to schedule a meeting of the SQRC for March 7. By this time – though the record is not clear precisely how – three instances of alleged malpractice on Armin's part had doubled to six.

The March 7 meeting was put over a week, apparently to accommodate a religious holiday.[7] The postponement allowed Armin to write a lengthy letter to Nagappan and Dozier, dated March 12, presenting his side of the story. Nine of its 15 pages addressed in detail the six cases, and according to Armin, two of the six involved operations done back when he was employed by RNA. He said Douglas and Clark had concurred in his approach to those two surgeries at the time.

Preliminary to his defense of the merits of the six cases, Armin outlined the history of his unhappy relationship with Douglas and Clark. Included was a reiteration of Armin's insistence that the de facto control of the surgery call panel at RCH by Douglas and Clark was against the law and that patients sometimes require more urgent nighttime care than Douglas and Clark were willing to provide. The hearing, which threatened the possibility of summary suspension, prompted Armin to cancel three surgeries scheduled for March 14.

According to Armin, he misunderstood the protocol for the March 14 meeting, and didn't show up when it was scheduled to begin because he thought the committee would first deal with his own complaints against the hospital and doctors

---

[7] March 7 that year was the "Fast of Ester" (or Esther), which marks the beginning of Purim, a holiday commemorating the saving of exiled Jews from their antagonist Haman, who is the villain of the story and sometimes described as a "vizier" to the Persian king Ahasuerus, who is often identified with Xerxes.

7

Douglas and Clark, and only require his presence when the meeting turned to the topic of his own alleged malpractice.[8]  The SQRC meeting resulted in a recommendation to the MEC, itself due to meet March 20, that Armin be summarily suspended.  Armin responded with a letter to Dozier dated March 19, apologizing for missing the March 14 meeting and promising to cooperate with the SQRC and MEC from then on.

The next step was an MEC meeting held March 21.  Armin *did* show up for this one.  He was told one of the six cases of alleged malpractice was being dropped, but after Armin was "dismissed" (his word) from the meeting, the MEC summarily suspended his privileges at RCH.

At this point the briefing and record become problematic in explaining the remainder of the peer review proceedings.  What is clear, however, is that, on appeal, the hospital admits Armin is *still* entitled to a full evidentiary hearing in front of the JRC on the five remaining alleged instances of malpractice.  Further, Armin has timely requested such a hearing.[9]  Moreover, the hospital recognizes that, after the JRC hearing has been completed, nothing will be final until the RCH board takes final action.

And that's where the trail ends in this case's third phase – with a still-to-be completed JRC hearing.  In fact, we are told in the hospital's respondent's brief that Armin's peer review hearing "was still in its preliminary stages at the time" he filed "this claim" in November 2012.

---

[8]    This information is contained in a letter Armin wrote to Dozier on March 19, stating he was under the misimpression that the SQRC would first be discussing the five pages of complaints about RCH and Douglas and Clark before it would get to the allegations of his own malpractice.  That was, as he wrote, a "misunderstanding."

[9]    The appellate briefing includes a dispute about precisely *why* the remainder of the administrative proceedings have not yet been completed; the mutual finger-pointing could be a synecdoche for the entire case.  In his opening brief Armin suggests the hospital has wanted to delay the proceedings to prejudice the merits of the disciplinary proceedings against him (see App. Opn. Br. at p. 9), while the hospital responds by asserting it has been Armin who has been delaying proceedings by (unreasonably) objecting to proposed panel members.  (See Resp. Br. at p. 24, fn. 17.)   The only matter in the record bearing on the point is Dozier's declaration to the effect that Armin and his attorneys have "questioned potential panel members and [have] successfully challenged some of them."

(4) *Late 2012-Present: The period of litigation.* On November 12, 2012, Armin filed this action. The hospital responded with an anti-SLAPP motion and demurrers. A commissioner heard those matters in May 2013. Commissioner Durand-Barkley determined the anti-SLAPP motion should be granted as to the section 1278.5 cause of action because she believed Armin had not exhausted his administrative remedies given the unfinished peer review process. She also ruled the demurrer to the section 1278.5 action was moot. The commissioner denied the anti-SLAPP motion as to the religious discrimination claims, because the hospital's conduct was outside the protection of the anti-SLAPP statute. She also overruled the demurrer to the religious discrimination claims.

In July, retired Judge Argento formally incorporated the commissioner's rulings into a court order and awarded the hospital $12,440 in attorney fees. Armin timely appealed from the order to the degree it struck his section 1278.5 cause of action and awarded fees. The hospital cross-appealed from the order to the degree it denied the request to strike the religious discrimination claims.

## III. DISCUSSION

A. *The Relationship of Peer Review and Section 1278.5 Claims*[10]

1. *The Fahlen Decision*

Seldom does an appeal present in sharper relief a dispute over the meaning and scope of a California Supreme Court opinion. In *Fahlen, supra*, 58 Cal.4th 655, a doctor asserted substandard care was provided by certain nurses, culminating in a series

---

[10] There is no question here that Armin's section 1278.5 claim arises entirely from activity protected by the anti-SLAPP statute – namely peer review proceedings – so the hospital can attack it on an anti-SLAPP motion. *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192 (*Kibler*) held that hospital peer review proceedings are within the protection of the anti-SLAPP statute.

That takes care of prong one of the traditional anti-SLAPP two-prong analysis. We therefore proceed directly to prong two: whether the plaintiff has shown "minimal merit" in opposition to the defendant's anti-SLAPP motion. (See *Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 ["Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit – is a SLAPP, subject to being stricken under the statute."].)

of "disruptive interactions" with them.  Disciplinary proceedings against the doctor proceeded through the MEC stage to the JRC stage and all the way to the board stage. The board reversed an exoneration by the JRC.  The result was that the board found the doctor's "'abusive and contentious behavior'" toward hospital staff "inappropriate," and terminated his privileges.  (*Fahlen, supra*, 58 Cal.4th at pp. 662-664.)  The doctor then filed a section 1278.5 action (along with other causes of action) against the hospital without first bringing a civil action in administrative mandate.  (See Code Civ. Proc., § 1094.5.)  As in the present case, the hospital filed both an anti-SLAPP motion and demurrers.  The appellate court upheld the trial court's refusal to grant the anti-SLAPP motion as regards the section 1278.5 action,[11] in the process expressly disagreeing with *Nesson, supra*, 204 Cal.App.4th 65, to the degree that *Nesson* required a successful civil action in administrative mandate before a physician could bring a whistleblower claim under section 1278.5.  (*Fahlen, supra*, 58 Cal.4th at p. 666.)  The disagreement in the intermediate appellate courts teed up the case for Supreme Court review, and the high court narrowed the issue carefully:  Was a successful judicial mandate proceeding a "necessary condition to the filing of a section 1278.5 action."  (*Fahlen, supra*, 58 Cal.4th at p. 666.)  To that question, the answer was no.  (*Ibid.*)

The *Fahlen* court framed the issue meticulously, and its research and analysis was nothing less than exhaustive.  The *Fahlen* opinion is a tour de force analysis of the interaction between section 1278.5 and the peer review process.  Since the issues before us are closely related, it is worth careful recounting of *Fahlen*'s analysis.

The law prior to *Fahlen*, as stated in *Nesson*, was that a physician had to exhaust the peer review process *and then also* successfully challenge that internal administrative result in a judicial mandamus proceeding before bringing a section 1278.5

---

[11]     The trial court got to the right result, but under the wrong rationale.  The trial court erroneously thought the administrative proceedings did not qualify for anti-SLAPP protection.  (*Fahlen, supra*, 58 Cal.4th at p. 665.)  The trial court's assumption was wrong under *Kibler*.  (*Fahlen, supra*, 58 Cal.4th at p. 666.)

claim. (See *Nesson, supra*, 204 Cal.App.4th at pp. 84-85.) For that result, *Nesson* relied on *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465 (*Westlake*), which was decided more than two decades prior to the enactment of section 1278.5.[12]

*Nesson* specifically relied on *Westlake* to hold that a physician denied reappointment at a hospital after a summary suspension was required to exhaust the internal peer review process before bringing – among other claims – a section 1278.5 action. (See *Nesson, supra*, 204 Cal.App.4th at pp. 84-85 [citing or quoting *Westlake* three times in quick succession].) In that reliance, *Nesson* cited *Westlake* for a straightforward two-step rule: A physician must (1) complete the internal peer review process *and* (2) bring an administrative mandate action before bringing *any* claims against a hospital related to a hospital's discipline, including a section 1278.5 action.[13]

*Fahlen* was decided two years later. What did *Fahlen* change? According to appellant hospital, the only thing *Fahlen* did was to clip off (2) the mandamus proceeding requirement from the *Westlake* two-step, leaving (1), the internal exhaustion requirement, in place. And the hospital's reading is not a bleacher seat view. Cases are not authority for propositions not "actually considered and decided therein," (*In re Chavez* (2003) 30 Cal.4th 643, 656), and *Fahlen* did not go as far as we do. But reading *Fahlen* convinces us the Legislature intended doctors' section 1278.5 claims and peer review proceedings to proceed at the same time.

*Fahlen* began with a thorough review of previous Supreme Court precedent bearing on the topic of administrative exhaustion under whistleblower statutes other than

---

[12]    The *Westlake* decision involved a physician, whose privileges had already been revoked, seeking damages under various tort theories centered on an alleged conspiracy of other doctors to restrain competition. (See *Westlake, supra*, 17 Cal.3d at pp. 469-471.) While the *Westlake* court held that the physician had indeed exhausted her *internal* administrative remedies (*id.* at p. 477), it said she still needed to "initially succeed in a mandamus action before pursuing [her] tort remedy." (*Id.* at p. 478.)

[13]    Because the *Nesson* court did not have the benefit of the *Fahlen* opinion, it offered no in-depth analysis of section 1278.5. Its single paragraph addressing the doctor's section 1278.5 claim appears to have been based on the eight-month time lag between the doctor's whistleblowing (when he complained about transcriptions and patient safety) and his summary suspension. (*Nesson, supra,* 204 Cal.App.4th at p. 87.)

11

section 1278.5. (See *Fahlen, supra*, 58 Cal.4th at pp. 668-675, primarily discussing *Westlake, supra,* 17 Cal.3d 465 [both internal and judicial exhaustion required before physician could challenge termination of staff privileges]; *Campbell v. Regents of University of California* (2005) 35 Cal.4th 311 [because there was no evidence of statutory intent to displace common law rule requiring administrative exhaustion, state architect was required to file administrative complaint before proceeding with civil whistleblower action]; *Arbuckle, supra*, 45 Cal.4th 963 [judicial exhaustion not required where relevant statute required complaint with state personnel board but no comment on requirement of judicial mandamus]; and *Runyon v. Board of Trustees of California State University* (2010) 48 Cal.4th 760 (*Runyon*) [following *Arbuckle*, judicial exhaustion not required].)

After its review of the existing case law, the *Fahlen* court focused on section 1278.5 specifically. *Fahlen* first noted the previous decisions involved statutes which themselves imposed, either impliedly or expressly, requirements of exhaustion before "an administrative body." (*Fahlen, supra*, 58 Cal.4th at p. 676.) It noted that, in contrast, section 1278.5 has no such requirement. (*Ibid*.)

And then the *Fahlen* court pointed out something quite remarkable about the nature of section 1278.5. While a peer review disciplinary proceeding might be an instrument of retaliation, such a proceeding is not a suitable forum for "redressing" the alleged misconduct on the *hospital's* part about which an allegedly errant physician might have complained. (See *Fahlen, supra*, 58 Cal.4th at pp. 677-678.) The court recognized that it makes little sense to impose an administrative exhaustion requirement for a complaint about unsafe patient practices where the very administrative proceeding to be exhausted – focused on the complainer's own conduct – cannot itself afford any relief. (Accord, *Payne, supra*, 130 Cal.App.4th at p. 739 [peer review process wasn't the remedy for claims of race discrimination].)

12

The distinction was bolstered by the high court's allusion to a point made in at least two of its earlier decisions (*Arbuckle* and *Runyon*), to the effect that a prerequisite of a judicial mandate proceeding would seriously compromise the legislative purpose of whistleblower statutes. Such proceedings are very hard to win if the hospital's procedures were fair. (*Fahlen, supra*, 58 Cal.4th at p. 678.)

Then came the coup de grace, found in *Fahlen's* dissection of the legislative history of section 1278.5 – especially the amendments of 2007 that added subdivision (h) to the statute in its current form: "The legislative history of section 1278.5, subdivision (h) is consistent with a conclusion that the Legislature did not intend to require postponement of a section 1278.5 action *even while peer review proceedings against the plaintiff were still in progress, let alone* until the final peer review decision had been set aside by mandamus." (*Fahlen, supra*, 58 Cal.4th at p. 680, italics added.)

The legislative history to which the court alluded is important for our purposes because it demonstrates a harmony between the raw text of subdivision (h) and the Legislature's intent in writing the text the way it did. Section 1278.5 is a relatively recent statute, having been enacted in 1999. (Stats. 1999, ch. 155 (S.B. 97), § 1.) In 2007, the Legislature extended its coverage to hospital staff physicians. (See *Fahlen, supra*, 58 Cal.4th at p. 679.) With the 2007 amendments came new subdivision (h), which is so critical here.

The *Fahlen* court's own shorthand paraphrase of subdivision (h) asserts a view of subdivision (h) with which we find reassuring: The Legislature was obviously contemplating the possibility that section 1278.5 actions could happen at the same time as hospital peer review proceedings. In addition to what we have already quoted, the court said: "Under this provision, a hospital's medical staff may petition the court for an injunction, *pending completion of a peer review process*, to protect the peer review committee from having to comply with such demands 'from the complainant' if they 'would impede the peer review process or endanger the health and safety of patients of

13

the [hospital].' (*Ibid.* [quoting Stats. 2007, ch. 683, § 1, p. 5809.])  Thus, *by its terms, subdivision (h), as added by the 2007 amendments, envisions that hospital peer review proceedings against a physician, on the one hand, and the physician's section 1278.5 whistleblower action, on the other, might coexist simultaneously*." (*Fahlen, supra*, 58 Cal.4th at pp. 679-680, italics added.)

It was precisely that idea – that section 1278.5 actions and peer review proceedings "might coexist simultaneously" – that triggered CHA to try to get the Legislature to change its mind about subdivision (h).  The story of the legislative battle between the proponents of the 2007 amendments and their major opponent, the CHA, goes on for about 3 pages in the opinion.  (*Fahlen, supra*, 58 Cal.4th at pp. 680-682.)  Its conclusion is a clear recognition of legislative intent *not* to require completion of peer review disciplinary proceedings before the filing of a section 1278.5 action.

The CHA, according to a Senate Judiciary Committee analysis, "was concerned that extension of whistleblower protection to hospital staff physicians would have a chilling effect *on peer review proceedings*, because 'the bill could stop a *peer review process* in its tracks by the simple filing of a section 1278.5 action . . . .,' or 'could compel *a peer review committee to not initiate a peer review process* for fear that it could be considered a retaliatory action  . . . .'" (*Fahlen, supra*, 58 Cal.4th at p. 680, quoting Sen. Com. on Judiciary, Analysis of Assem. Bill No. 632, as amended June 6, 2007, p. 9; original italics deleted, new italics added.)  So the committee analysis addressed the danger of evaporation of the usual "protections and immunity" afforded a "*pending* peer

14

review action" if a section 1278.5 proceeding was allowed to proceed at the same time. (*Fahlen, supra*, 58 Cal.4th at p. 680, italics added.)[14]

The Legislature did indeed respond to the CHA's worry that peer review proceedings might indeed be considered retaliatory action under section 1278.5, but it was not the response the CHA hoped for. (See *Fahlen, supra*, 58 Cal.4th at p. 680.) Rather, the Legislature's answer was merely to give peer review committees the opportunity to enjoin civil discovery demanded by the physician *if* such discovery would impede the peer review proceeding itself. (*Fahlen, supra*, 58 Cal.4th at p. 681.)

Unsatisfied, the CHA redoubled its efforts, expressing concern that peer review would be "'significantly undermined'" if a physician could "'move directly into court without completing the fair hearing process.'" (*Fahlen, supra*, 58 Cal.4th at p. 681.) The CHA also proposed an amendment that would have stated section 1278.5 does not apply to any peer review disciplinary action "'unless and until'" the physician had "'substantially prevailed in such action as specific in current law.' [Citation.]'' (*Ibid.*, original italics of *Fahlen* court omitted.)

Again the Legislature rebuffed the CHA. (*Fahlen, supra*, 58 Cal.4th at pp. 681-682.) Instead of adopting the position the hospital now advocates – that the physician must substantially prevail in the disciplinary proceedings as a prerequisite to a section 1278.5 action – the Legislature just added a new subdivision (*l*) to section 1278.5. And subdivision (*l*) merely said section 1278.5 is not to be construed to – and the italics are the Supreme Court's own here – "'limit the ability of medical staff to carry out its *legitimate* peer review *activities*" in accordance with the peer review statutes, Business

---

14      We reproduce the passage from the committee analysis; readers should note the italics are the *Fahlen* court's own: "The analysis further declared that '[t]he critical question, according to the principal opponents of [Assembly Bill No.] 632, is what would happen to a pending peer review action, or to the evidentiary protections and immunity from liability that attend peer review actions, *once the member of the medical staff files a [section ] 1278.5 action*? The hospital, CHA states, could very well be required to produce evidence in the [section] 1278.5 action even *before* that evidence has been fully developed and presented in a [m]edical [s]taff fair hearing under [Business and Professions Code section] 809 et seq.'" (*Fahlen, supra*, 58 Cal.4th at p. 680, quoting Sen. Com. on Judiciary, Analysis of Assem. Bill No. 632, *supra*, as amended June 6, 2007, p. 10.)

15

and Professions Code sections 809 through (at the time) 809.5.  (*Fahlen, supra*, 58 Cal.4th at p. 681, quoting § 1278.5, subd. (*l*), Assem. Bill No. 632, as amended in Sen., Sept. 5, 2007.)[15]

The CHA plunged once more into the breach, this time explicitly arguing that subdivision (h) was still "not good enough" because – and the CHA's way of reading the subdivision was revealing – "it 'does not . . . address the real issue, which is *allowing someone to get into* court on a retaliation claim *while* a peer review action is either still in the investigatory stage[,] . . . or *underway, . . .  but the hearing/appeal is not yet completed and the [hospital's] governing body has not yet taken final action*.'"  (*Fahlen, supra,* 58 Cal.4th at p. 682, italics added, quoting David van der Griff, CHA Legis. Advocate, CHA, Assem. Floor Alert regarding Assem. Bill No. 632 (Sept. 10, 2007) at p. 2.)

Again the CHA's efforts were in vain.  "[T]he Legislature made no changes in response to the CHA Assembly Floor Alert."  (*Fahlen, supra*, 58 Cal.4th at p. 682.)  The *Fahlen* court then described what the Legislature did – better said, *didn't do* – this way:  "Nonetheless, the Legislature made no changes in response to the CHA Assembly Floor Alert.  Specifically, it left intact subdivision (h), in which, as noted above, the Legislature indicated its understanding that a civil action under section 1278.5 might be commenced, and civil discovery attempted, *while peer review proceedings were still underway*."  (*Ibid.*, italics added.)

The *Fahlen* court's reading of subdivision (h) was thus more than enough to dispose of the main issue before the high court.  If Dr. Fahlen might have brought a section 1278.5 action while first-step peer review proceedings were "underway," then a fortiori he need not have prevailed in a second-step *judicial* mandamus action in order to file a section 1278.5 action.  (*Fahlen, supra*, 58 Cal.4th at p. 682.)  In the process the

---

15    Sometimes italics says more than just "pay attention."  Here they seem to express recognition of the possibility of illegitimate peer review activities.

16

court disapproved *Nesson* – which clearly did require a successful judicial mandate action prior to a section 1278.5 action – to the "extent" it was "inconsistent with our conclusion." (*Id.* at p. 687.)

2. *The Plain Text of Section 1278.5*

To be sure, as noted above, *Fahlen* doesn't actually *hold* that internal administrative exhaustion of peer review proceedings do not apply to a section 1278.5 action – though it seems to us to come about as close as possible to doing so without actually saying so. But for appellant hospital, everything *Fahlen* said about subdivision (h) is mere "dicta" because the grant of review "limited the issue" to whether a physician was required to prevail in judicial mandate proceedings prior to commencing a section 1278.5 action. (See *Fahlen, supra*, 58 Cal.4th at p. 666.) In fact, appellant hospital even goes on to take issue with the way the Supreme Court read subdivision (h), asserting the high court read it too expansively. Accepting *arguendo* their argument the court's analysis was dicta and we have the power to disagree, we find nothing to disagree with.

First of all, even if what the Supreme Court said was, technically, dicta, that dicta still reflects persuasive research, handed to us on a platter. And second, even if *all* we had was the naked text of section 1278.5, that text would draw us to the same conclusion as the *Fahlen* dicta.

The operative core of section 1278.5 for purposes of this case is subdivision (b), which provides that "No health facility shall discriminate or *retaliate, in any manner*, against any patient, employee, member of the medical staff, or any other health care worker of the health facility because that person has done either of the following: [¶] (A) Presented a grievance, *complaint*, or report to the facility, to an entity or agency responsible for accrediting or evaluating the facility, or the medical staff of the facility, or to any other governmental entity." (Italics added.) The statute goes on, in subdivision (d)(1), to establish a "rebuttable presumption" of retaliatory action if the "discriminatory action" taken in retaliation against a complainer "occurs within 120 days of the filing of

17

the grievance or complaint."[16]  And retaliatory action, according to subdivision (d)(2) includes suspension of "privileges" of a health care worker.

Next the statute conveys the message that the remedy for *retaliation* for complaining about unsafe hospital care is to be found in civil court, not peer review disciplinary proceedings.  Subdivision (g) states the remedy for retaliatory action is, among other things, reinstatement and reimbursement for lost "work benefits" as "deemed warranted *by the court* pursuant to this chapter or other applicable provision of statutory or common law."  (Italics added.)

And then comes subdivision (h), which is not only obviously predicated on the existence of an ongoing court action, but also envisions the possibility of a simultaneous peer review proceeding.  "The medical staff of the health facility *may petition the court for an injunction* to *protect a peer review committee* from being *required to comply with evidentiary demands on a pending peer review hearing from the member of the medical staff who has filed an action pursuant to this section*, *if* the evidentiary demands from the complainant would impede the peer review process or endanger the health and safety of patients of the health facility during the peer review process.  Prior to granting an injunction, the court shall conduct an in camera review of the evidence sought to be discovered to determine if a peer review hearing, as authorized in Section 805 and Sections 809 to 809.5, inclusive, of the Business and Professions Code, would be impeded.  *If* it is determined that the peer review hearing will be impeded, the injunction *shall* be granted *until the peer review hearing is completed.* Nothing in this section shall preclude *the court*, on motion of its own or by a party, from issuing an injunction or other order under this subdivision in the interest of justice *for the duration of the peer review process* to protect the person from irreparable harm." (§ 1278.5, subd. (h), italics added.)

---

16    Readers should recall here that the doctor in *Nesson* would not have had the advantage of this presumption, given the eight-month lag between complaint and alleged retaliation.

18

As the italicized words show, subdivision (h) gives a hospital's medical staff the conditional opportunity to seek a court injunction to stop discovery propounded by a section 1278.5 plaintiff upon a showing of interference with an *ongoing* peer review proceeding. Moreover, discovery can be stopped until the completion of the proceeding. The obvious implication is that section 1278.5 actions and peer review proceedings can coexist simultaneously. And it is in that regard that subdivision (*l*) – the nothing construed to "limit the ability of the medical staff to carry out its legitimate peer review activities" clause – is best understood: A section 1278.5 plaintiff doesn't get to stop peer review proceedings, but peer review proceedings can, if the right showing is made under subdivision (h), stop discovery in section 1278.5 actions. From that structure we derive the obvious legislative intent: The Legislature is fine with peer review proceedings barreling on even if a section 1278.5 action is filed in civil court.

The hospital counters this analysis by arguing that the correct reading of subdivision (h) still excludes the possibility of simultaneous peer review proceedings and section 1278.5 actions for physicians who are *themselves* the object of peer review proceedings. According to the hospital, subdivision (h) only refers to those instances where Doctor A has brought a section 1278.5 action and needs the evidence of Doctor B where Doctor B is at the same time the subject of peer review proceedings. In such an instance, says the hospital, there is no need for exhaustion of Doctor B's peer review proceedings in order for Doctor A's section 1278.5 action to proceed. (Resp. br. at p. 54.) On the other hand, says the hospital, if Doctor A is himself or herself the object of peer review proceedings, Doctor A is still required to complete the peer review proceeding before bringing a section 1278.5 action. [17]

---

[17] The hospital also posits a hypothetical involving a hospital's retaliation against one doctor by terminating his or her *lease* in the hospital's office building for having complained of unsafe conditions at the hospital. (See Resp. br. at pp. 54-55.) This hypothetical, along with the Doctor A-Doctor B scenario, constitutes the sum total of the supposed "many reasons," the hospital concludes (see Resp. br. at p. 54), that the Legislature still wanted to require doctors who are the objects of peer review proceedings to first complete those proceedings before bringing a section 1278.5.

There are two reasons this argument is unpersuasive. Most obviously, there is nothing in the text of subdivision (h) that makes any sort of distinction between classes of section 1278.5 plaintiffs. The hospital's argument amounts to reading into the statute an implied differentiation between "good" section 1278.5 plaintiffs who do not personally face peer review proceedings, and "bad" section 1278.5 plaintiffs who do. We cannot find a basis for such differentiation.

The second reason is, ironically, found in the one item of text on which the hospital relies here: the use of the indefinite article "a" in subdivision (h) as in the phrase "evidentiary demands on *a* pending peer review hearing from the member of the medical staff who has filed an action pursuant to this section[.]" (Italics added.) The hospital argues the use of the word "a" as in "a pending peer review" limits the scope of the subdivision to good physicians (no pending peer review), and excludes bad physicians (facing contemporaneous peer review).

The argument fails grammatically because the use of the indefinite article "a" – as in "a pending peer review hearing" – signals exactly the opposite of what the hospital says it means. According to the hospital, the phrase "a pending peer review hearing" *limits* the set of such hearing to physicians *not* facing such hearings. That's incorrect. The use of the *indefinite* article in the words "a pending peer review proceeding" signifies *any* pending peer review proceeding, including one brought by a physician who has also brought a section 1278.5 action. As our high court said in *Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1396-1397: "Use of the indefinite articles 'a' or 'an' signals a *general reference*, while use of the definite article 'the' (or 'these' in the instance of plural nouns) refers to a specific person, place, or thing." (Italics added.)

---

Both hypotheticals seem fairly strained to us. The natural implication of allowing doctors to be section 1278.5 plaintiffs – which was the whole point of the 2007 amendments in the first place – is to protect doctors from retaliation.

3. *Policy Arguments*

A continuing leitmotif in the hospital's briefing is sheer revulsion at what the hospital considers the self-evident absurdity of a doctor who is himself or herself the object of peer review disciplinary proceedings being able to *de facto retaliate* against medical staff for having brought a peer review disciplinary action in the first place – a kind or retaliation for a perceived retaliation. For the hospital, the idea of doctors having such a power is just incomprehensible and, so the hospital concludes, the Legislature could not have possibly intended such a result.

We are sympathetic to the hospital's concern, but we cannot put that horse back in the barn. The hospital's trade association fought valiantly and indefatigably on the point in 2007, and is free to try again to get an amendment to the statute to make it say what they want, but we don't make policy, we explain it. (E.g., *People v. Whitmer* (2014) 59 Cal.4th 733, 759.)

In that regard, we should say that two points demonstrate the Legislature's choice was not only rational, but also makes positive sense. The first is that the Legislature's essential focus in both peer review proceedings *and* in section 1278.5 actions is to protect the *public*, not the reputation of either hospitals or individual doctors. As the *Fahlen* court noted, the "common aim of both schemes" is the "safe and competent care of hospital patients." (*Fahlen, supra,* 58 Cal.4th at p. 684.) And to protect *patients*, it makes perfect sense to allow *everybody's* dirty linen to be aired as soon as possible, not just the complaining doctor's.

Second, there are structural protections which prevent the abuse of section 1278.5 that the hospital fears – namely errant physicians using section 1278.5 to obtain de facto immunity from the peer review proceeding. The common law legal dynamics of retaliation statutes requires a prima facie showing of a *causal connection* between an adverse action and the complaint that allegedly engendered the retaliation. (See *Chen v. County of Orange* (2002) 96 Cal.App.4th 926, 948-949.) Absent such a showing, the

21

retaliation claim is unviable. (*Id*. at p. 931.) And even if the plaintiff does make a prima facie showing of a causal connection, that merely shifts the case into the classic *McDonnell Douglas* burden-of-proof ping pong.[18] In that back and forth burden-shifting, the hospital would have the opportunity to demonstrate the reason for the *initiation* of its peer review proceedings was perfectly legitimate. The plaintiff would then be required to show the initiation of such proceedings was just pretextual, i.e., the real reason was to retaliate against the plaintiff for some earlier complaint about unsafe patient care. All that is *hardly* an interference with the peer review process as long as – to allude to subdivision (*l*) – the hospital's peer review action is *legitimate* in the first place, i.e., not itself retaliatory.

4. *Application to the Facts at Hand*

In the present case, it is clear that Armin has indeed made the necessary prima facie showing of retaliation required by section 1278.5. The salient event for Armin's section 1278.5 claim is not the March 12 letter; Armin's section 1278.5 whistleblowing claim is based on his *December 2011 conversation* with the hospital's COO in which he complained about Douglas and Clark's lackadaisical approach to urgent care. He alleged they would sometimes delay treatment or transfer patients for their own convenience.[19]

*That* complaint was easily within the 120-day period of presumptive retaliation under subdivision (d)(1) of section 1278.5, and distinguishes this case from

---

18    See *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792.

19    Once again we must resolve conflicts in the plaintiff's favor. We therefore conclude that Douglas and Clark's alleged "call me in the morning" approach to brain surgery patients who may need an urgent evaluation does indeed come within section 1278.5's protection for complaints about unsafe patient care and conditions. Perhaps in another context Douglas and Clark might be able to show the allegation is groundless, or that supposedly needed urgent evaluations can always be postponed to the next day, but on this record we assume that some patients may need an urgent nighttime evaluation from their brain surgeon.

There is also the matter of Douglas and Clark's alleged monopoly control over RCH's call schedule. At first blush, that seems more a matter of economics than medicine. However, again, on this record we will assume such monopolization has at least an indirect impact on actual patient care, in that it might deny patients access to urgently needed brain surgery or evaluations by limiting the number of doctors available.

22

*Nesson*. In *Nesson*, the court found *no* relationship between the physician's complaint and the subsequent peer review proceedings. Here, we have at least a statutory presumption of such a relationship. Armin complained to RCH's COO in December 2011, about Douglas and Clark's approach to patients, and the very next month Douglas initiated a peer review proceeding against Armin. That is well within the 120-day statutory presumption of retaliation set forth in subdivision (d)(1).[20] We also note that Armin had complained to RCH's CEO as far back as 2010-2011 about Douglas and Clark's approach to patients. Though that fact does not entitle Armin to a *presumption* of retaliation, it constitutes substantial evidence that Armin's section 1278.5 was not just some opportunistic legal salvo fired off when the peer review proceedings began in January 2012.

The hospital may be able eventually to demonstrate that its instigation of peer review proceedings against Armin was perfectly legitimate and *not* in any way pretextual. Or perhaps the case will be shown to be one of "mixed motives." (See generally *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203 (*Harris*) [exploring problem of dual motives, one lawful and the other unlawful].) However, given the standard of review on anti-SLAPP motions, we must indulge Armin's evidence the peer review was instigated in retaliation for his complaints about Douglas and Clark and was founded on flimsy and insubstantial allegations of malpractice on Armin's part.

---

[20] This statutory presumption readily distinguishes this case from this court's concern in *Chen* that something more than mere time sequence be required to establish retaliation, lest a court fall into the post hoc ergo prompter hoc fallacy. (See *Chen, supra*, 96 Cal.App.4th at p. 931.) It must also be remembered that the employee in *Chen* (a deputy district attorney) was complaining about being blocked for promotion when there were already "obviously good and legitimate reasons not to promote her[.]" (*Id*. at p. 931.) That's different from a situation where, as here, a plaintiff in Armin's situation – *not* already facing some sort of adverse action – is hit with that action after making a complaint of some sort of illegal or unsafe practice.

Moreover, given the statutory presumption, we think it makes no difference at this stage of the litigation that Armin has yet to find a smoking gun in the form of evidence that Douglas and Clark were told of Armin's complaints to the COO the month prior to the initiation of the proceedings. It is a reasonable inference, given the closeness of the sequence, that they found out somehow about his complaints about them.

5. *The Federal Preemption Argument*

As did the hospital in *Fahlen*, the hospital here claims immunity from section 1278.5 proceedings by virtue of a federal statute immunizing hospitals from damage claims arising out of peer review proceedings, namely the Health Care Quality Improvement Act of 1986 (HCQIA) found at 42 U.S.C. § 11101 et seq.

*Fahlen* had something to say about the HCQIA argument too, though we note the hospital's brief makes no attempt to come to grips with what *Fahlen* actually said. Briefly, *Fahlen* said this: HCQIA cannot provide *blanket* immunity to a hospital in a section 1278.5 action because even if HCQIA applies to a given peer review proceeding, "at a minimum" it still allows "such remedies as reinstatement and injunctive relief." (*Fahlen, supra*, 58 Cal.4th at p. 686.) Moreover – and we find this particularly significant given the anti-SLAPP procedural posture of the case before us – the *Fahlen* court recognized the immunity afforded by HCQIA is only presumptive and hence rebuttable: "Moreover, it allows the presumption of immunity to be rebutted by a preponderance of evidence that the peer review participant acted without adequate effort to ascertain the relevant facts, or had no reasonable ground to believe, based on the known facts, that the action was warranted on quality of care grounds." (*Ibid.*) The high court was making the point that whether HCQIA immunity applies involves factual matters. And of course, on the record before us, such matters cannot be resolved against Armin as a matter of law when there is conflicting evidence. We therefore need not wade into the collateral debate that HCQIA doesn't even apply in California on the theory the state opted out of it.

B. *Claims Against Individual Physicians Under Section 1278.5*

But Armin has sued not only RCH for retaliation in violation of section 1278.5, he has also sued four individual doctors (Dozier, Nagappan, and of course Douglas and Clark) for their roles in the initiation and continuation of the peer review process. So we must decide whether section 1278.5 allows claims against individual

24

doctors. We conclude section 1278.5 does *not* allow individual doctors to be sued – even if their motives are not honorable, as alleged by Armin here. The judgment is therefore affirmed to the extent that it lets the four individual doctor defendants out of Armin's section 1278.5 suit.

Section 1278.5, focuses on the "facility" as the target defendant under the statute. Subdivision (a), the statement of intent, expresses the Legislature's concern that people who work at hospitals be protected when they notify government entities of unsafe patient care or conditions.[21] Subdivision (b) is the operative subdivision, forbidding facilities, *and only facilities*, from retaliating against individuals who complain of potentially unsafe care or conditions – even if they complain to somebody other than a government entity. The civil penalty provision in subdivision (b) confirms the focus on the hospital-facility, by referring the reader to statutes regulating nursing homes.[22]

Subdivision (d)(1), the 120-day presumption, only deals with facilities or entities that own or operate facilities. Subdivision (d)(1) also differentiates between, on the one hand, the facility (or owners or operators of those facilities) and, on the other hand, the "responsible staff" whose knowledge can trigger that presumption.

Subdivision (d)(2) likewise defines retaliatory treatment, albeit nonexclusively, in terms of the sorts of things *only* a facility can do, like imposing "unfavorable changes" in working conditions. Subdivision (g), listing remedies, parallels subdivision (d)(1)'s listing of retaliatory actions, and again identifies remedies of the sort that can only be imposed on a facility *qua* facility, such as "reinstatement, reimbursement

---

[21] For an idea of the sort of fear by doctors from retaliation by hospitals that led to the 2007 amendments, see Jones, *Chapter 683: Extending Whistleblower Protections to Members of the Medical Staff of Health Facilities* (2008) 39 McGeorge L. Rev. 519, 520, fns. omitted ["Although many factors contributed to the corruption at Tenet [the owner of Redding Medical Center, where patients were receiving unnecessary open heart surgery], it became evident after the scandal broke that the medical staff felt that they could not speak out against the unethical surgeons without fear of retribution."]

[22] Section 1417 et seq.

for lost wages and work benefits caused by the acts of the employer."  Finally, none of the other subdivisions – except the one we are about to discuss – contain any hint of liability for individual doctors.

The exception is subdivision (i).  To impose liability on individual doctors, Armin relies entirely on subdivision (i), which defines, for purposes of section 1278.5, "health facility" to mean "any facility defined under this chapter, including, but not limited to, the facility's administrative personnel, employees, boards, and committees of the board, and *medical staff*."  (Italics added.)   Stressing the words "medical staff," Armin posits that the statute allows suits against individual doctors on the medical staff.

One searches in vain for a statutory definition of the words "medical staff." That is not surprising given that a separate statute in the Business and Professions Code, section 2282, requires hospitals to adopt their own rules regarding the organization and definition of medical staffs.  There are, however, statutory limits.  We know that "medical staffs" can only include doctors and like professions, since subdivision (b) of Business and Professions Code section 2282 restricts membership in medical staffs to "physicians and surgeons and other licensed practitioners competent in their respective fields and worthy in professional ethics."

Case law likewise reflects the fact hospitals typically define "medical staff" to encompass the *entire corpus* of physicians who enjoy privileges at the facility.  (See *Pomona Valley Hospital Medical Center v. Superior Court* (2012) 209 Cal.App.4th 687, 691 [bylaws defined "medical staff" as "'the formal organization of all licensed physicians, dentists, and podiatrists who are privileged to attend patients in the Hospital'"]; *Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 756 [noting bylaws defined medical staff "to mean those physicians 'who have been granted recognition as members of the medical staff pursuant to the terms of these bylaws'"]; *Smith v. Selma Community Hospital* (2008) 164 Cal.App.4th 1478, 1485 [bylaws defined medical staff as "'those physicians, dentists, podiatrists, and clinical psychologists who

26

have been granted recognition as members of the medical staff pursuant to the terms of these bylaws'"]; and *Bonner v. Sisters of Providence Corp.* (1987) 194 Cal.App.3d 437, 440, fn. 1 [bylaws defined medical staff as "physicians, dentists, and podiatrists"].)

The phrase medical staff is thus a uniplural entity, like church or team or jury.[23] Since the words certainly *include* doctors (the way the word jury includes its individual members), Armin argues that section 1278.5's definition of "facility" allows him to sue the *individual members of* a hospital's medical staff.

There are three separate reasons we reject this argument and conclude that by "medical staff" the Legislature meant the uniplural corporate body which brings peer review proceedings against individual members of that "medical staff" rather than individual staff members. Reason one is a variation on that old statutory canon, *ejusdem generis*, which is pedantry for: Pay attention to the kinds of things that are listed in a series. Here, if we pay attention to the entities identified in subdivision (i) that make up the definition of "facility," we find they *all* have this in common: They are all means by which a hospital acting as its own legal person might retaliate against a complaining doctor, nurse or patient.

In particular, the "medical staff" is the entity (singular) in whose name peer review proceedings under sections 805 through 809.7 of the Business and Professions Code are brought. Business and Professions code section 809, subdivision (a)(8) – a statute antedating section 1278.5 –speaks of medical staffs in their corporate, uniplural

---

23    In American English, we typically emphasize the singular in such words: "The Medical Staff *is* bringing charges against Dr. Armin," "the church *is* taking up a collection to help local homeless," "the company *is* lowering its prices." The British have a tendency to emphasize the plurality inherent in such words, e.g., "Her Majesty's Government *are* going to adopt a new policy," "the jury *are* going to deliberate," "Manchester United *were* unable to find the net," and even perhaps "The Medical Staff *are* bringing charges against Dr. Armin."

sense.[24]  By the same token subdivision (i) is important for what it doesn't say:  It doesn't say *anyone* who instigates a retaliatory act, or any "member of the medical staff who instigates a retaliatory act."  It merely says "medical staff."

Reason two is the legislative history of Assembly Bill No. 638 for the 2007-2008 legislative session, the battle over which has given us the current version of section 1278.5 much of which we recounted in our discussion of *Fahlen*.)  Hospitals must have self-governing medical staffs, and those staffs must adopt rules governing appropriate standards for patient care.  The staff, in turn, acts through peer review committees.  (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 10.)  Thus when we look at the legislative history of subdivision (i), we find that committee reports simply *equated* "medical staff" with what hospitals do.  Indeed, one of the arguments the CHA made in opposing Assembly Bill No. 632 was that, given the independence of the medical staff in the hospital disciplinary structure, it was unfair to "impute" the actions of the medical staff, acting as an independent body instigating a peer review proceeding, *to* the hospital itself.[25]

But the most basic reason to construe "medical staff" not to mean "members of the medical staff" is to further the legislative intent which engendered

---

[24]  Business and Professions Code section 809, subdivision (a)(8) provides:  "(8) Sections 809 to 809.8, inclusive, shall not affect the respective responsibilities of the organized medical staff or the governing body of an acute care hospital with respect to peer review in the acute care hospital setting.  It is the intent of the Legislature that written provisions implementing Sections 809 to 809.8, inclusive, in the acute care hospital setting shall be included in medical staff bylaws that shall be adopted by a vote of the members of *the organized medical staff and shall be subject to governing body approval*, which approval shall not be withheld unreasonably."  (Italics added.)

[25]  This argument was made by CHA lobbyist David van der Griff in a letter to the Chair of the Senate Judiciary Committee dated June 18, 2007, while Assembly Bill No. 632 was still under consideration, and then later to Governor Schwarzenegger on September 17, 2007, urging his veto.  The CHA's argument was also recounted in the Senate Judiciary Committee Bill Analysis for Assembly Bill No. 632, as amended June 6, 2007, at page 11:  "In addition to expanding the coverage of whistleblower protections to medical staff and other health care workers, this bill would extend liability for a violation to the owner or operator of a health facility.  Further the bill would define 'health facility' to include the 'medical staff' as well as administrative personnel.  *According to the opponents, under existing law a hospital medical staff is required to be a self-governing body and therefore its actions cannot and should not be imputed to the hospital.*  [¶]  To the proponents, however, these are simply clarifying amendments to existing law, and do not in any way increase the liability of a health facility for its discriminatory or retaliatory acts against a whistleblower."  (Italics added.)

28

section 1278.5 in the first place. The idea was to protect doctors who spotted problems with *hospital* patient care or conditions. Applying section 1278.5 liability to individual doctors could greatly complicate the achievement of that purpose.

Peer review proceedings are not just potential instruments of retaliation. They can also be the instrument by which alarms about patient care can be aired. Thus doctors Douglas and Clark have the same right to be whistleblowers about Armin's allegedly substandard care that Armin has to be a whistleblower about theirs. And it makes no difference if the *vehicle* for Douglas and Clark's complaints is a peer review proceeding. Construing "medical staff" as Armin urges would make it harder to root out bad practices rather than easier. We therefore affirm the trial court's judgment dismissing the four individual doctor defendants from the case.[26]

C. *The Religious Discrimination Claims*

Armin's religious discrimination causes of action survived the defendants' anti-SLAPP motion, and that survival is the subject of a cross-appeal by the hospital. In denying the anti-SLAPP motion, the trial judge noted the obvious: According to Armin, Douglas and Clark attempted to use Armin's religion against him by imposing on him assignments incompatible with Jewish holidays long prior to any allegations of malpractice made against him. The court thus concluded Armin's religious discrimination claims do not come within prong one of anti-SLAPP analysis, and hence were not vulnerable to an anti-SLAPP motion.

The hospital does not attempt to argue that vexatious scheduling is *itself* protected activity under section 425.16 – an obviously untenable position. Rather, it argues that because Armin's claims here are somehow "intertwined" with, the "same facts and circumstances currently being evaluated in hospital peer review proceedings,"

---

[26] Armin had every right to name the uniplural unincorporated association "medical staff" of RHC in his section 1278.5 claim because subdivision (i) says he can. But the *nature* of any potential remedy he might have against that entity, singular, should he ultimately prevail, can await another day.

there is a sufficient connection between those claims and the peer review proceedings themselves to bring his religious discrimination claims within the anti-SLAPP statute.

We reject the argument because it is predicated on a putative "intertwining" which we can't find. All of the vexatious scheduling at issue occurred *prior* to the January 2012 initiation of the peer review proceeding. Scheduling aimed at incommoding Armin's desire to observe the Jewish holidays implicates conduct outside of what the anti-SLAPP statute protects: peer review proceedings as "official proceedings" under *Kibler*. It makes no difference that Armin first brought his complaints about vexatious scheduling to light in his March 12 letter that also involved his defense of the malpractice claims in the context of a peer review proceeding. In terms of anti-SLAPP analysis, Armin could just as easily have filed a complaint concerning his religious claims without first making any complaint to hospital management. (See *Payne, supra*, 130 Cal.App.4th at p. 739 [internal peer review process did not give physician who alleged race discrimination by hospital the right to do more administratively than just complain; physician's remedy was in court].)

Put another way, Armin's religious discrimination claim is not based on mixed protected and non-protected activity under *Baral*. (See *Baral, supra*, 1 Cal.5th at p. 392 ["But when the defendant seeks to strike particular claims supported by allegations of protected activity that appear alongside other claims within a single cause of action, the motion cannot be defeated by showing a likelihood of success on the claims arising from unprotected activity."].) It arises *entirely* from the hospital's unprotected activity engaged in prior to the initiation of the peer review process. The hospital's motion thus does not get beyond prong one of anti-SLAPP analysis.

This prong one determination is sufficient for affirmance of the trial court's judgment as it pertains to the religious claims. We therefore do not reach the hospital's arguments that Armin's religious claims are otherwise susceptible to dismissal on the

30

merits, and we express no opinion as to what might happen if the hospital brought a summary judgment motion.

## IV.  DISPOSITION

The formal order of July 15, 2013, striking Armin's section 1278.5 action and awarding attorney fees to the hospital, is hereby reversed with directions to enter a new order denying the motion to strike the section 1278.5 action and denying the hospital's request for attorney fees in conjunction with its anti-SLAPP motion.  At this point we echo the *Fahlen* court's observation that trial courts may have several tools, such as stay or delay, to insure that a section 1278.5 action does not indeed interfere with the peer review proceedings.  (See *Fahlen, supra*, 58 Cal.4th at pp. 684-685 [suggesting several possibilities as to how trial court's might accommodate both section 1278.5 actions and peer review].)  We leave to the trial court further questions as to whether Armin's section 1278.5 action should or should not be stayed or delayed pending the completion of the peer review proceeding.  On the other hand, the trial court's order is affirmed to the degree that it denies the hospital's motion to strike Armin's religious discrimination claims.  Armin will recover his costs on appeal.


                                                    BEDSWORTH, ACTING P. J.
WE CONCUR:


IKOLA, J.


THOMPSON, J.


31

Filed 11/17/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SEAN ARMIN,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>RIVERSIDE COMMUNITY HOSPITAL,<br><br>    Defendants and Appellants;<br><br>MEDICAL STAFF OF RIVERSIDE<br>COMMUNITY HOSPITAL et al.,<br><br>    Defendants and Respondents. | G052125<br><br>(Super. Ct. No. RIC1217004)<br><br>ORDER CERTIFYING OPINION<br> FOR PUBLICATION |

Our opinion filed on November 16, 2016 meets the standards for publication set forth in California Rules of Court, rule 8.1105(c)(1), (2), (6), and (7). The opinion is hereby ordered published in the Official Reports.


BEDSWORTH, ACTING P. J.

WE CONCUR:


IKOLA, J.


THOMPSON, J.