Filed 2/27/17

# CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| HOOMAN MELAMED,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CEDARS-SINAI MEDICAL CENTER et al.,<br><br>    Defendants and Respondents. | B263095<br><br>(Los Angeles County<br>Super. Ct. No. BC551415) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael M. Johnson, Judge. Affirmed.

Greene, Broillet & Wheeler, Mark T. Quigley, Christian T.F. Nickerson; Esner, Chang & Boyer and Stuart B. Esner for Plaintiff and Appellant.

Glaser Weil Fink Howard Avchen & Shapiro, Patricia L. Glaser, Joel N. Klevens; Nossman, Mitchell J.

Green; Greines, Martin, Stein & Richland, Robin Meadow and Jeffrey W. Raskin for Defendants and Respondents.

_____

Dr. Hoomad Melamed (Plaintiff), a physician at Cedars-Sinai Medical Center, operated on a 12-year-old patient, causing complications requiring corrective surgery. The hospital suspended Plaintiff, who requested a peer review hearing challenging the suspension.  Every level of administrative review upheld the suspension.  Plaintiff did not seek mandamus review of these decisions.  Plaintiff then filed suit against Cedars-Sinai Medical Center (Cedars), its medical staff, and the specific doctors involved in the summary suspension decision.  The hospital filed an anti-SLAPP motion, contending that Plaintiff's claims arose out of a protected activity—the medical staff's peer review process—and that Plaintiff could not show a probability of success on the merits.  The trial court granted the motion.

We affirm.

## STANDARD OF REVIEW

Known as the anti-SLAPP[1] statute, section 425.16 of the Code of Civil Procedure[2] provides that a "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech

_____

[1] SLAPP is the acronym for strategic lawsuit against public participation.

[2] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

2

under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

Resolving an anti-SLAPP motion is a two-step process. First, the trial court must determine whether the defendant has made a prima facie showing that the challenged cause of action arises from protected activity. (*People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 822.) If the defendant makes that showing, the trial court proceeds to the second step, determining whether the plaintiff has shown a probability of prevailing on the claim.[3] (*Ibid.*)

Subdivision (e) of section 425.16 delineates the type of speech or petitioning activity protected. Such acts include: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an

---

[3] An appellate court reviews a trial court's ruling on an anti-SLAPP motion de novo, using the same two-step process. (*Coretronic Corp. v. Cozen O'Connor* (2011) 192 Cal.App.4th 1381, 1387.)

issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."[4]  (§ 425.16, subd. (e).)

Courts have not precisely defined the boundaries of a cause of action "arising from" such protected activity. (§ 425.16, subd. (b).)  "[T]he statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.  [Citation.]  In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech."  (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.)

Whether the statute applies is determined from the "*principal thrust* or *gravamen*" of the plaintiff's claim. (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188.)  In making these determinations, the trial court "considers 'the pleadings, and supporting and opposing affidavits.' "  (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.)  We review the trial court's ruling

---

[4] A defendant who invokes subparagraph (1) or (2) need not "separately demonstrate that the statement concerned an issue of public significance."  (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123.)

4

on the motion to strike independently under a de novo standard. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.) We do not weigh credibility, but accept as true the evidence favorable to plaintiff. We evaluate the defendant's evidence only to determine whether it defeats the plaintiff's evidence as a matter of law. (*Id.* at p. 326.)

# FACTUAL BACKGROUND

## A. The Surgery

On July 11, 2011, Plaintiff performed elective surgery on a 12-year-old patient for scoliosis. Plaintiff selected the operating table and also positioned the patient on the table. Due to the patient's small size, however, Plaintiff ran into trouble during the surgery. The patient's back was unstable and her pelvis dipped, which exacerbated her spinal curvature and made the surgery extremely difficult. Plaintiff then realized he had chosen both the wrong sized table as well as hip and thigh pads for this patient.[5]

During the surgery, Plaintiff asked the nurses if he could get much bigger pads than what he had chosen but was told those pads were not available. He then asked a nurse to go under the operating table to stabilize the patient. Plaintiff also asked for a different kind of operating table but

---

[5] Plaintiff later confirmed that he was responsible for positioning the patient and that he had chosen the wrong table for this sized patient. He admitted that he should have stopped and moved her to another table before attempting to complete the surgery. By not doing so, Plaintiff admitted he had worsened the patient's condition.

5

was told the specific kind of table he had requested mid-surgery was not available.

Although he was unable to physically stabilize his patient, Plaintiff continued, and even expanded, the surgery. As a result, the operation lasted eight to eleven hours, rather than the normal three to five hours.

The surgery left the patient in far worse condition, and she now had an exaggerated inward curvature of the lower spine as well as abrasions on her face and body. Indeed, Plaintiff described the deformity as "clearly obvious" and needing correction within a few days.

## B.     Plaintiff's Summary Suspension

On July 13, 2011, the hospital's operating room manager (Kyung Jun) visited the patient to check on the abrasions caused by her prolonged surgery. The patient's parents were present at the time. According to the parents, Plaintiff had told them that the patient was too small for the table he had used during the surgery, and that he needed a special table, which the hospital did not have. Jun reassured the parents that the hospital had the necessary equipment for the patient's corrective surgery. Jun then spoke with Plaintiff to discuss what he needed for the upcoming surgery. Plaintiff confirmed that the hospital did in fact have the equipment he needed for the surgery. Jun

6

emailed this information to Dr. William Brien that same day.[6]

On or about July 14, 2011, Dr. Brien initiated a peer review investigation into the surgery.[7] The hospital expedited its investigation because the patient was still hospitalized and awaiting additional corrective surgery. Dr. Brien called Plaintiff about the case that day. Plaintiff confirmed he was responsible for choosing the wrong surgical table and for positioning the patient. He also denied complaining to anyone, including the patient's parents, that the hospital did not have the appropriate surgical table available. Plaintiff also admitted he had not yet completed his required postoperation report.

According to Plaintiff's description of the call, however, Dr. Brien began by immediately asking, "Are you going around the hospital and telling everyone that Cedars doesn't have the capability to do this case?" Plaintiff says he told Dr. Brien that it had been difficult to stabilize the patient due to the inadequate table and pads, and that if the correct equipment had been available, the patient would have had a successful surgical outcome.

Dr. Brien consulted with the chairman of Department of Surgery, who concurred that Plaintiff posed an immediate

---

[6] Dr. Brien was the director of Cedars-Sinai's Orthopedics Center and executive vice chairman for the department of surgery at that time.

[7] An operating room nurse also filed an incident report online.

and imminent risk to hospital patients, especially since Plaintiff had chosen to continue surgery on his 12-year-old patient even though he could not stabilize her body, and would have to perform corrective surgery on her within the next few days.

On July 15, 2011, Cedars summarily suspended Plaintiff's medical staff privileges. As required, the hospital provided Plaintiff with a notice of action, advising Plaintiff of the charges and his hearing rights. The hospital based the summary suspension on the surgery, which raised "concerns regarding [Plaintiff's] judgment, technical skill, and competency in managing scoliosis cases." These concerns were based on his choice of the wrong table for the patient's size and procedure, his failure to adequately stabilize the patient, and his continued attempts to manipulate the patient's spine despite his inability to stabilize her. In addition, the notice stated, "the surgery lasted in excess of 11 hours, which apparently contributed to the pressure areas that the patient sustained."

That same day, Plaintiff belatedly dictated his operative report.[8] The report noted the difficulty Plaintiff had during the surgery. It also noted that Plaintiff had asked for a different table and pads during the surgery but was told they were not immediately available.

---

[8] Operative reports are routine reports that become part of the patient's medical record. Surgeons must file these reports within 24 hours of all procedures.

On July 21, 2011, Plaintiff's attorney wrote the hospital, challenging the summary suspension. The letter did not criticize the hospital for failing to provide a different table and pads once Plaintiff realized he had chosen the wrong equipment. Instead, it stated that the table chosen by Plaintiff was in fact medically appropriate for this type of surgical procedure, noting that the surgeon who subsequently operated on the 12-year-old patient had used the same table. Notably, the letter did not contend that the hospital had suspended Plaintiff in retaliation for any complaints.

On July 27, 2011, Plaintiff filed a petition for mandamus and a TRO to set aside the summary suspension. As with the letter from Plaintiff's counsel, these filings did not suggest Plaintiff was concerned with equipment safety or believed he had been suspended in retaliation for any complaints.[9] Instead, Plaintiff's primary challenge focused upon his suspension by a hospital administrator rather than a peer review committee.[10] On August 1, 2011, the hospital

---

[9] Indeed, Plaintiff repeated his prior claim that the operating table he had used was medically appropriate for the type of surgery he had conducted, and was used during the patient's corrective surgery. Plaintiff also maintained that the patient was stabilized when the operation began and remained stabilized for a significant period of time during the procedure.

[10] Plaintiff voluntarily dismissed the petition on November 4, 2011.

reported Plaintiff's summary suspension to the state medical board and the National Practitioner Data Bank as required by law.

### C. The Peer Review Hearing

On August 29, 2011, Plaintiff requested a peer review hearing to challenge his summary suspension. The hospital issued an amended notice of action, lifting the suspension as to adult patients. It maintained the suspension with respect to pediatric patients. The evidentiary portion of the peer review hearing lasted from September 2012 to November 2013. The hearing committee heard from 17 witnesses and had 60 exhibits at its disposal. As before, Plaintiff did not contend he had complained to the hospital about available equipment or patient safety. Nor did he contend that his summary suspension or his peer review hearing were retaliation for making that complaint.

The hearing committee issued its report on January 13, 2014. The committee found that the Department of Surgery had "acted reasonably in conducting an investigation of the case" due to the "unsatisfactory correction of the patient's spinal curvature and the harm to the patient of a worsened post-surgical spinal curvature, pressure sores, an extended fusion, a prolonged hospitalization and a second surgery."

Based on this evidence, the hearing committee found that Plaintiff's summary suspension had been reasonable and warranted. However, the committee concluded that terminating Plaintiff's clinical privileges to treat pediatric,

adolescent and adult scoliosis was not reasonable or warranted.[11]

Plaintiff appealed the hearing committee's decision to uphold the summary suspension.[12] Plaintiff's appeal did not claim that the hospital had suspended Plaintiff for any retaliatory reasons. Each level of review upheld the hearing committee's finding Plaintiff's summary suspension reasonable and warranted. Plaintiff did not seek mandamus review of this decision.

### D. Plaintiff's Subsequent Lawsuit

Plaintiff filed suit on July 11, 2014—exactly three years after the surgery. On July 21, 2014, Plaintiff filed a first amended complaint (FAC), the operative complaint in this case, against Cedars-Sinai Medical Center, its medical staff, and the specific doctors involved in the summary suspension decision.[13] For the first time, Plaintiff alleged

---

[11] Nevertheless, the committee found it would be reasonable and warranted for the medical executive committee to authorize a prospective review of the clinical management of Plaintiff's pediatric and adolescent scoliosis cases.

[12] Plaintiff had three levels of review available to him after the hearing committee issued its ruling: the medical executive committee (first level), the appeal committee (second level), and the board of directors (final level).

[13] Defendants are collectively referred to as "the hospital" or "Defendants."

11

that the hospital's actions were taken in retaliation after Plaintiff had complained about patient safety at the facility.

Centered on this allegation, the FAC presented seven causes of action: (1) violation of Health and Safety Code section 1278.5, (2) tortious interference with prospective economic relations, (3) tortious interference with contractual relations, (4) unfair competition in violation of Business and Professions Code section 17200 et seq., (5) violation of Business and Professions Code section 16700 et seq., (6) violation of Business and Professions Code sections 510 and 2056, and (7) wrongful termination of hospital privileges.

The hospital filed an anti-SLAPP motion, contending that Plaintiff's claims arose out of a protected activity—the medical staff's peer review process—and that Plaintiff could not show a probability of success on the merits. According to the hospital, Plaintiff' could not prevail on his claims because they were barred by the statute of limitations. Moreover, Plaintiff had failed to exhaust his judicial remedies and could not establish a prima facie case of retaliation.

## THE TRIAL COURT'S RULING

As correctly noted by the trial court, an anti-SLAPP motion involves a two-step process: "(1) the defendant must establish that the challenged causes of action arise from protected activity; and (2) if the defendant makes this showing, the burden shifts to the plaintiff to establish a probability of success on the merits."

12

With respect to the first step, the court found that "[a]ll of Plaintiff's causes of action are based on the allegations that he made reports of unsafe and substandard hospital conditions and services that posed a threat to patients." Plaintiff also contended that "Defendants responded to this action by summarily suspending his medical staff privileges, reporting the summary suspension to state authorities, and subjecting Plaintiff to a protracted and unfair peer review process."

Citing *Kibler v. Northern Inyo County Local Hosp. Dist.* (2006) 39 Cal.4th 192, 198 (*Kibler*), and *Nesson v. Northern Inyo County Local Hospital Dist.* (2012) 204 Cal.App.4th 65, 78 (*Nesson*), the court found that Plaintiff's allegations all related and arose from the hospital's peer review proceedings, which qualified as an "official proceeding authorized by law" and thus constituted protected activity under section 425.16, subdivision (e)(2).[14] Because Plaintiff's claim arose from Defendants' protected activity, the burden shifted to Plaintiff to submit admissible evidence supporting a prima facie case in his favor. However, Plaintiff could not

[14] Plaintiff argued that his claims did not arise from Defendants' protected activity because the hospital's peer review process proceedings were not the exclusive basis for his claims. The court rejected this argument, finding that the gravamen or principal thrust of Plaintiff's claims focused on the peer review process, including the hospital's decision to suspend his staff privileges, report the suspension to state authorities, and subject Plaintiff to a protracted and unfair peer review process.

13

establish a probability of success on the merits on any of his seven claims.

## A.  Plaintiff's First Claim

Health and Safety Code section 1278.5 provides, in relevant part, that "[n]o health facility shall discriminate or retaliate, in any manner, against any . . . member of the medical staff" because that person has "[p]resented a grievance, complaint, or report to the facility . . . or the medical staff of the facility" or "[h]as initiated, participated, or cooperated in an investigation or administrative proceeding related to, the quality of care, services, or conditions at the facility that is carried out by an entity or agency responsible for accrediting or evaluating the facility." (Health & Saf. Code, § 1278.5, subd. (b)(1)(A)-(B).)

The statute expressly provides a rebuttable presumption that discriminatory action was taken by the health facility in retaliation against a member of the medical staff if responsible staff at the facility knew about the medical staff member's actions and the discriminatory treatment occurred within 120 days of the medical staff member filing a grievance or complaint.[15]  (Health & Saf. Code, § 1278.5, subd. (d)(1).)

---

[15] Discriminatory treatment includes "demotion, suspension, or any unfavorable changes in, or breach of, the terms or conditions of a contract, employment, or privileges of the . . . medical staff member, . . . or the threat of any of these actions."  (Health & Saf. Code, § 1278.5, subd. (d)(2).)

14

With respect to Plaintiff's first claim, the court found that Plaintiff had failed to submit a sufficiently explicit complaint regarding improper or inadequate procedures at the hospital. Thus, Plaintiff could not show, as required by Health and Safety Code section 1278.5, subd. (b)(1)(A)-(B), that he had filed "a grievance, complaint, or report" regarding "the quality of care, services, or conditions at the facility."

Although the hospital had two channels for reporting safety and quality concerns, Plaintiff did not use either one. Instead, he "merely reported his surgical procedures and complications to the parents of his patient and in his post-operation surgical report." While protected activity does not require a formal procedure, the court observed, "it at least requires a clear communication that puts the employer on notice as to what wrongful conduct it should investigate or correct." Plaintiff's routine postsurgical reports did not meet this standard.

Even if Plaintiff's postsurgical reports did meet the statutory notice requirements, the court found he could not show a causal connection between this protected activity and the hospital's allegedly retaliatory conduct. Although Plaintiff contended that the hospital initiated the peer review process based on his complaints, the court found this was not the case. Instead, the hospital began the process because of a complaint that a surgical manager made *against* Plaintiff. Indeed, Plaintiff's postsurgical report was not transcribed, let alone received by the hospital until after

15

Defendants had initiated the peer review process.[16]  Thus, in addition to failing to present a sufficiently detailed grievance regarding conditions at the hospital.  Plaintiff could not establish a presumption of retaliation under Health and Safety Code section 1278.5, subdivision (d)(1).

### B.    Plaintiff's Remaining Claims

The trial court also held that Plaintiff did not show a reasonable probability that he could succeed on his remaining causes of action.  Citing *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465,469 (*Westlake*), the court found that although the claims were expressly based on Plaintiff's summary suspension and the hospital's peer review process, Plaintiff had not attempted to overturn any aspect of the peer review determinations in a mandamus action.[17]  Consequently, these claims were barred for failure to exhaust judicial remedies.

---

[16] The hospital began its peer review process on July 14, 2011.  Plaintiff dictated his postsurgical report that same day.  Plaintiff's report was not transcribed until July 15, 2011.  Until it was transcribed, the report was not available to anyone at the hospital.

[17] Plaintiff argued that judicial exhaustion was not required because many of the peer review determinations were in his favor, but the court found that this argument greatly misstated his case.  Furthermore, although Plaintiff repeatedly asserted that the peer review process had been protracted and unfair, he never petitioned for mandamus on the ground that he did not receive a fair hearing.

## DISCUSSION

We review the trial court's ruling on the motion to strike de novo. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.) Thus, we must determine whether Defendants have made a prima facie showing that the challenged cause of action arises from the hospital's protected activity. (*People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 822.) If Defendants have made that showing, we then proceed to the second step, determining whether Plaintiff has shown a probability of prevailing on his claims. (*Ibid*.)

## I.     The Hospital Engaged in Protected Activity

In *Kibler*, *supra*, 39 Cal.4th at page 198, our Supreme Court held that an anti-SLAPP motion was available to a hospital and its medical staff regarding their actions in a peer review proceeding where the disciplined physician later sued for interference with his practice of medicine. There, the hospital summarily suspended the physician's staff privileges for two weeks, but reinstated them after he agreed to refrain from certain behaviors. (*Id*. at p. 196.) *Kibler* reasoned that a lawsuit arising from a peer review proceeding is subject to a special motion to strike because it qualifies as " 'any other official proceeding authorized by law' " pursuant to section 425.16, subdivision (e)(2). (*Id*. at p. 198; *DeCambre v. Rady Children's Hospital-San Diego* (2015) 235 Cal.App.4th 1, 14 [applying *Kibler* to anti-SLAPP motion filed by hospital in lawsuit arising from peer review proceedings].)

17

In so holding, the court relied on three considerations. First, peer review proceedings are required of hospitals and heavily regulated. (*Kibler, supra*, 39 Cal.4th at pp. 199–200.) Second, because hospitals are required to report the results of peer review proceedings to the state medical board, peer review proceedings play a "significant role" in aiding the appropriate state licensing boards in their responsibility to regulate and discipline errant practitioners. (*Id.* at p. 200.) Third, "[a] hospital's decisions resulting from peer review proceedings are subject to judicial review by administrative mandate. [Citation.] Thus, the Legislature has accorded a hospital's peer review decisions a status comparable to that of quasi-judicial public agencies whose decisions likewise are reviewable by administrative mandate."[18] (*Ibid.*) As such, peer review proceedings constitute "official proceedings authorized by law" under section 425.16, subdivision (e)(2). To hold otherwise would discourage participation in medical peer reviews by allowing disciplined physicians to sue hospitals and their peer review committee members rather than seeking administrative relief. (*Ibid.*)

The Court of Appeal reached a similar result in *Nesson, supra*, 204 Cal.App.4th 65 (revd. in part on other grounds in

---

[18] Because peer review decisions are reviewable by administrative mandate, Plaintiff's reliance on *Donovan v. Dan Murphy Foundation* (2012) 204 Cal.App.4th 1500, 1508 (conduct was not protected activity under § 425.16 because it was not subject to judicial review) is misplaced.

18

*Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655 (*Fahlen*)).  In *Nesson*, a radiologist sued a hospital for breach of contract, retaliation, and discrimination after the medical executive committee summarily suspended his medical staff privileges and the hospital terminated his contract to provide radiology services.  (*Nesson*, at p. 72.)  The hospital filed a special motion to strike under the anti-SLAPP statute, arguing the complaint targeted a protected activity and that the radiologist could not demonstrate a probability of success on the merits given that he had not exhausted his administrative or judicial remedies.  (*Id.* at p. 75.)  The trial court granted the hospital's motion, and the radiologist appealed, contending that his summary suspension and subsequent termination did not constitute protected activity.  (*Id.* at pp. 76, 78.)

The Court of Appeal affirmed the dismissal.  The court characterized *Kibler*, *supra*, 39 Cal.4th 192 as holding that hospital peer review proceedings, including the discipline imposed upon a physician, constitute official proceedings authorized by law.  (*Id.* at p. 78.)  The gravamen of each cause of action asserted by Nesson was that the hospital "somehow acted wrongfully when it terminated the [radiology service agreement] because Nesson's privileges were summarily suspended, as he was deemed by the [medical executive committee] to be a likely imminent danger to patient safety."  (*Id.* at p. 83.)

Plaintiff's attempt to distinguish *Kibler*, *supra*, 39 Cal.4th 192 is unavailing. Plaintiff maintains that his

19

claims, unlike the claims in *Kibler*, concern retaliation by defendants in violation of a specific statute that precludes such conduct. However, "the first step of the anti-SLAPP analysis focuses on the acts the plaintiff alleges as the basis for his or her claims, not the motive or purpose the plaintiff attributes to the defendant's acts; the first step considers whether those acts constitute acts in furtherance of the constitutional rights of free speech or petition." (*Collier v. Harris* (2015) 240 Cal.App.4th 41, 53–54.)

Indeed, " '[a]ny "claimed illegitimacy of the defendant's acts is an issue which the plaintiff must raise *and* support in the context of the discharge of the plaintiff's [*secondary*] burden to provide a prima facie showing of the merits of the plaintiff's case." ' " (*Collier v. Harris*, *supra*, 240 Cal.App.4th at p. 54, italics added.) Thus, even if Plaintiff's case differs from *Kibler*, *supra*, 39 Cal.4th 192 in this respect, it is immaterial when analyzing the *first* step, determining whether Plaintiff's cause of action arises from the hospital's protected activity.

Plaintiff's attempt to distinguish *Nesson*, *supra*, 204 Cal.App.4th 65 is similarly unavailing. Although *Fahlen*, *supra*, 58 Cal.4th 655 did disapprove one portion of *Nesson*, this holding does not affect our first step analysis. *Fahlen* held that a "hospital staff physician who claims a hospital decision to restrict or terminate his or her staff privileges was an act in retaliation for his or her whistleblowing in furtherance of patient care and safety need not seek and obtain a mandamus petition to overturn the decision before

filing suit under [Health and Safety Code] section 1278.5."[19] (*Id.* at p. 687.) To the extent *Nesson* was inconsistent with this particular conclusion, the decision was disapproved. (*Fahlen*, at p. 687.) However, this holding is relevant only at the *second* step of our review, when we examine whether a plaintiff's failure to exhaust alternative remedies precludes us from reaching the merits of a claim. (*Westlake, supra,* 17 Cal.3d 465.)

Nevertheless, Plaintiff maintains "[t]his is not a situation where the plaintiff is claiming that a statement made during the process was defamatory; or that the process itself was not fair, as in *Kibler*[*, supra,* 39 Cal.4th 192.]" Nor is this "a situation where the claim arises out of the process itself, as in *Nesson*[*, supra,* 204 Cal.App.4th 65.]" In short, Plaintiff, insists, the decision to institute proceedings against Plaintiff and what occurred during those proceedings are legally distinct concepts. According to Plaintiff, the decision to institute proceedings is not a reviewable aspect of the peer review process.

However, here, as in *Kibler, supra,* 39 Cal.4th 192, Plaintiff's causes of action arise out of the hospital's peer review process in relation to a summary suspension. Moreover, the act of summarily suspending Plaintiff is a part

---

[19] The Fourth District has since held that a physician need not complete the internal peer review process before filing a Health and Safety Code section 1278.5 action either. (*Armin v. Riverside Community Hospital* (2016) 5 Cal.App.5th 810, 814.)

21

of the peer review process, as set forth in the hospital's bylaws, and as analyzed by the Supreme Court in *Kibler*.[20]

---

[20] Thus, this case is distinguishable from *McConnell v. Innovative Artists Talent and Literary Agency, Inc.* (2009) 175 Cal.App.4th 169.  In *McConnell*, two talent agents sued their employer, alleging their employment contracts contained illegal provisions.  The next day, the employer had plaintiffs escorted from the office and sent them letters " 'temporarily modifying' " their job duties and instructing them not to come to the office, not to use company e-mail, not to attend any client or industry functions, and not to have telephone conversations or communications with clients or other employees.  (*Id*. at p. 172.)  Plaintiffs then amended their lawsuit to add retaliation and wrongful termination claims.  (*Ibid*.)  The employer filed a special motion to strike under the anti-SLAPP statute.  (*Id*. at p. 172.)  The trial court denied the motion, finding the two claims did not arise from protected activity.  Division Eight of our court affirmed, holding that plaintiffs' claims did not arise from the employer's letter, but from its action " 'temporarily modifying' " plaintiffs' job duties, effectively precluding them from engaging in any of the ordinary activities of a talent agent.  (*Id*. at p. 176.)  "The fact that these 'modifications' . . . were reduced to writing [did] not convert them from conduct affecting the conditions of employment to protected free speech activity."  (*Ibid*.)  In short, the plaintiffs' retaliation and wrongful termination claims did not arise from any protected activity.  Here, however, the complained-of conduct (the summary suspension) was an integral part of the protected activity (the peer review process).  Thus, in this case, Plaintiff's claims do arise from protected activity.

Indeed, *Kibler* expressly held that the peer review summary suspension was protected conduct because it is a component of an official proceeding, subject to judicial review by administrative mandate, that hospitals have been tasked with in order to monitor the professional conduct of physicians licensed in California. (*Id.* at pp. 198–201.) Like the plaintiff in *Kibler*, Plaintiff was suspended through the hospital's peer review process. The hospital's suspension of Plaintiff is likewise protected conduct. Thus, Defendants' acts relating to Plaintiff's suspension and peer review process constituted protected activity for purposes of the anti-SLAPP statute and Plaintiff's claims arise from that protected activity.[21]

## II  Plaintiff Cannot Show a Probability of Success

Once a defendant makes a prima facie showing that the anti-SLAPP statute is applicable to the conduct or

---

[21] Although Plaintiff contends that an anti–SLAPP motion cannot be granted as to causes of action that contain allegations of both protected and unprotected activity, as discussed above, Plaintiff's complaint does not contain mixed causes of action. Moreover, the California Supreme Court recently rejected this notion. "The anti-SLAPP procedures are designed to shield a defendant's constitutionally protected *conduct* from the undue burden of frivolous litigation." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 393.) "It follows, then, that courts may rule on plaintiffs' specific claims of protected activity, rather than reward artful pleading by ignoring such claims if they are mixed with assertions of unprotected activity." (*Ibid.*)

23

speech at issue, the burden shifts to the plaintiff to establish a "probability" that plaintiff will prevail on whatever claims are asserted against the defendant.  (§ 425.16, subd. (b)(1).) The plaintiff " ' "must demonstrate that the *complaint* is *both legally sufficient* and supported by a sufficient prima facie showing of facts to sustain a favorable judgment." ' " (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2006) 136 Cal.App.4th 464, 476.)

As noted above, " '[w]e consider "the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based." . . . However, we neither "weigh credibility [nor] compare the weight of the evidence.  Rather, [we] accept as true the evidence favorable to the plaintiff . . . and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." ' " (*Nygård, Inc. v. Uusi–Kerttula* (2008) 159 Cal.App.4th 1027, 1036.)

With respect to Plaintiff's first claim, Defendants contend that the claim must fail because it was filed past the applicable two-year statute of limitations.  Defendants also contend that even if a three-year statute of limitations applies here, which would render the claim timely, Plaintiff cannot establish a prima face case for this claim and thus cannot prevail.  With respect to Plaintiff's remaining claims, Defendants contend that Plaintiff failed to exhaust his judicial remedies and thus cannot prevail on his remaining claims.

## III. Plaintiff's First Claim

### A. *Statute of Limitations*

Plaintiff filed his FAC on July 21, 2014.  This was nearly three years after the hospital suspended him and reported the suspension to the medical board as well as the National Practitioner's Data Bank.

Health and Safety Code section 1278.5 does not specify a time period in which a claim for a violation of the statute must be filed.[22]  Plaintiff contends the three-year statute of limitations in Code of Civil Procedure section 338, subdivision (a) applies, while Defendants argue that the two-year time limit in Code of Civil Procedure section 335.1 should be used here.  Under section 338, subdivision (a), "[a]n action upon a liability created by statute, other than a penalty or forfeiture" must be brought within three years.  Under section 335.1, which addresses the time for commencing general tort claims, a plaintiff has two years to file suit.  No California appellate case has addressed the issue.  Nor did the trial court in this case.

However, it actually appears that a *one-year* statute of limitations may be appropriate here.  Section 340 specifies a limitations period of one year for an action upon a statute for a penalty, unless the statute imposing the penalty prescribes

---

[22] At least one state whistleblower statute specifies a statute of limitations.  Government Code section 12653, subdivision (c) provides that an action brought under this code section is subject to a three-year statute of limitations running from the date of the alleged retaliation.

25

a different limitation.  (§ 340, subd. (a).)  A penalty is mandatory under Health and Safety Code section 1278.5, subdivision (b)(3), which states that "a violation of this section *shall* be subject to a civil penalty" of not more than $25,000.  (Italics added.)  The statute's legislative history supports the proposition that Health and Safety Code section 1278.5 is a statute for a penalty.  (See Sen. Health & Human Servs. Com., Analysis of Sen. Bill No. 97 (1999–2000 Reg. Sess.) March 10, 1999, p. 2 [bill "requires a health facility that violates this provision to be subject to a civil penalty"]; see also Assem. Com. on Health, Analysis of Assem. Bill No. 632 (2007–2008 Reg. Sess.) April 10, 2007, p. 1 [although existing law subjects a health facility to civil penalty, this bill extends penalty provision to health facilities that retaliate against physicians].)

Thus, even if the FAC does not address whether Plaintiff seeks to recover the mandatory civil penalty imposed by Health and Safety Code section 1278.5, subdivision (b)(3), Plaintiff's first cause of action is still an action upon a statute for a penalty.[23]  Neither Plaintiff nor

---

[23] See *Minor v. FedEx Office & Print Services* (N.D.Cal. Apr. 25, 2016) 182 F.Supp.3d 966, 988–989 (examining a different state whistleblower protection law and noting that, under California law, retaliation claims are governed by the three-year statute of limitations for an action upon a liability created by statute, other than a penalty; but if the suit seeks a civil penalty under the whistleblower statute, then the claim is subject to the one-year limitations period for an action upon a statute for a penalty).

Defendants briefed the applicability of Code of Civil Procedure section 340 to this case. Furthermore, as discussed below, Plaintiff cannot establish a prima face case for this particular claim. Consequently, we need not, and do not, decide which limitations period is appropriate here.

**B.** ***Plaintiff Cannot Establish a Prima Facie Case***

To establish a prima facie case under Health and Safety Code section 1278.5, Plaintiff must satisfy three elements and show that he (1) "[p]resented a grievance, complaint, or report" to the hospital or medical staff (2) regarding the quality of patient care and; (3) the hospital retaliated against him for doing so. (Health & Saf. Code, § 1278.5; *Fahlen, supra*, 58 Cal.4th at p. 667, fn. 6 [although statute does not explicitly state "grievance, complaint, or report" must involve concerns about quality of patient care, limitation is implicit in other provisions of statute].)

With respect to the first element, the trial court found that although the hospital had two channels for reporting safety and quality concerns, Plaintiff did not use either one.[24] Instead, he "merely reported his surgical procedures

_____

[24] The hospital has two formal systems—the MIDAS Event Reporting System and MD Feedback—which allow medical staff members "to report any event or occurrence that could be inconsistent with the provision of high quality patient care, or any event that could adversely affect the health or safety of patients." It is undisputed that Plaintiff did not file a report using either system. In fact, other hospital staff members submitted MIDAS reports (and sent

27

and complications to the parents of his patient and in his post-operation surgical report." While reporting such concerns does not require a formal procedure, "it at least requires a clear communication that puts the employer on notice as to what wrongful conduct it should investigate or correct."[25] Plaintiff's routine postsurgical reports did not meet this standard.

Plaintiff's other purported communications suffer from the same deficiency. Asking a nurse mid-surgery if larger pads or a different operating table were available did not constitute whistleblowing. Plaintiff made his requests after realizing he had made a mistake in his operating room choices. Thus, Plaintiff's mid-surgery request did not, and indeed could not, alert the hospital that it needed to investigate and correct a problem with the facility itself.

Plaintiff's postsurgery conversation with the patient's parents also proves inadequate. Statements must be made to "the facility, to an entity or agency responsible for accrediting or evaluating the facility, or the medical staff of the facility, or to any other governmental entity" in order to

---

emails to management) outlining their concerns with the surgery, especially the dermal abrasions the patient had suffered as a result. Thus, Plaintiff was the subject of safety concerns, not its champion.

[25] See, e.g., *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1047 ("vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate will not suffice to establish protected conduct").

be protected under the statute. (Health & Saf. Code, § 1278.5, subd. (b)(1)(A).) Plaintiff's conversation with the parents clearly does not fall under the statute.

Nevertheless, Plaintiff maintains that Dr. Brien later learned about the conversation, thus transforming it into a protected complaint. Dr. Brien received an email informing him that Plaintiff had told the parents that the patient was too small for the table he had used during the surgery, and that he needed a special table, which the hospital did not have. Furthermore, according to the email, Plaintiff later assured the hospital that it did in fact have the equipment needed for the patient's upcoming surgery. Thus, rather than put his employer on notice as to what wrongful conduct it should investigate or correct, Plaintiff informed the hospital it did *not* have an equipment problem to remedy.[26] This cannot suffice as a protected complaint.

Nor can Plaintiff's postoperation report be deemed a protected complaint. An operative report must be documented within 24 hours for all patients following any inpatient or outpatient procedure. They are considered part of a patient's medical record and are not accessed by the hospital's leadership or administration "unless a specific question about quality, payment, or other health care operations has arisen." They are *not* used to alert the

---

[26] Indeed, when directly questioned by Dr. Brien, Plaintiff denied telling the parents that the hospital did not have the appropriate surgical table available.

hospital or its leadership about suspected unsafe patient conditions or quality of care concerns.

Furthermore, neither the content nor the timing of the report supports Plaintiff's contention that it constituted a "grievance, complaint, or report" under Health and Safety Code section 1278.5.  In the report, Plaintiff noted his unsuccessful mid-surgery request for larger pads and a different table.  Just before filing the report, however, Plaintiff admitted that he had underestimated the patient's small size and had chosen the wrong table as a result.[27]

The timing of the report also undercuts Plaintiff's claim.  Although the surgery took place on July 11, 2011, the report was not dictated until July 14, 2011, and was not transcribed until July 15, 201.  Until an operative report is transcribed, it is not documented and is not available for viewing by anyone.  By the time Plaintiff's report was transcribed, the hospital had already heard from other staff members concerned about the prolonged surgery.  These concerns, rather than the belated and non-accusatory operative report, triggered the inquiry that caused Plaintiff's summary suspension.  Thus, the report cannot suffice as a protected complaint and the hospital's decision to suspend Plaintiff cannot be deemed retaliatory.

---

[27] Plaintiff would later reverse course and maintain that the table he had chosen was in fact medically appropriate for this type of procedure.  Neither course blamed the hospital for the surgery's poor outcome, however.

30

### C. *Plaintiff's Remaining Claims*

In *Westlake*, *supra*, 17 Cal.3d 465, our Supreme Court held that the exhaustion of administrative remedies doctrine applies to hospital peer review proceedings. Thus, "before a doctor may initiate litigation challenging the propriety of a hospital's denial or withdrawal of privileges, he must exhaust the available internal remedies afforded by the hospital." (*Id.* at p. 469.)

Furthermore, "whenever a hospital, pursuant to a quasi-judicial proceeding, reaches a decision to deny staff privileges, an aggrieved doctor must first succeed in setting aside the quasi-judicial decision in a mandamus action before he may institute a tort action for damages."[28] (*Westlake*, *supra*, 17 Cal.3d at p. 469.) Once a court determines the hospital's quasi-judicial decision to be improper in a mandate action, the "excluded doctor may proceed in tort against the hospital, its board or committee members or any others legally responsible for the denial of staff privileges." (*Ibid.*)

In sum, before filing suit, Plaintiff had to exhaust both his administrative remedies (by undergoing the peer review process) and his judicial remedies (by seeking mandamus review of the peer review determinations).

Plaintiff repeatedly claims he emerged the victor in the peer review process and that judicial exhaustion was not

---

[28] Plaintiff's first claim is exempt from the exhaustion requirement. (*Fahlen*, *supra*, 58 Cal.4th 655, 687; *Armin v. Riverside Community Hospital*, *supra*, 5 Cal.App.5th 810.)

31

required because "there were no rulings he would want set aside" and "pursuing anything further would have been moot." However, Plaintiff also agrees, as he must, that the peer review process yielded at least one adverse finding—that his initial suspension was reasonable and warranted. Indeed, each level of review found this to be the case. As Plaintiff admits, and alleges in his complaint, this holding had real world consequences. Plaintiff's suspension was reported to the medical board and National Practitioner's Data Bank, which, in turn, damaged his reputation and career. Although Plaintiff appealed this determination throughout the peer review process, he did not seek mandamus review of this holding. Therefore, he may not challenge it now.

Nevertheless, Plaintiff notes that the parties did not litigate whether the hospital's decision to suspend Plaintiff was retaliatory. Indeed, they could not since Plaintiff failed to raise the allegation during the peer review process. Therefore, Plaintiff contends, judicial exhaustion has no application here. *Westlake*, *supra*, 17 Cal.3d 465 holds otherwise. (*Id.* at p.484 ["so long as such a quasi-judicial decision is not set aside . . . the decision has the effect of establishing the propriety of the hospital's action"].)

## DISPOSITION

The judgment is affirmed.  The parties are to bear their own costs on appeal.

CERTIFIED FOR PUBLICATION.


JOHNSON, J.


We concur:


CHANEY, Acting P. J.


LUI, J.

33