Filed 8/12/21  Sakellis v. Cedars-Sinai Medical Center CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

|  |  |
|---|---|
| HELENE SAKELLIS,<br><br>       Plaintiff and Appellant,<br><br>       v.<br><br> CEDARS-SINAI MEDICAL CENTER,<br><br>       Defendant and Respondent. | B300417<br><br>(Los Angeles County<br>Super. Ct. No. BC653918) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis Landin, Judge.  Reversed and remanded with directions.

Shegerian & Associates, Carney R. Shegerian and Mahru Madjidi, for Plaintiff and Appellant.

Proskauer Rose, Anthony J. Oncidi, Pietro A. Deserio, and Cole D. Lewis, for Defendant and Respondent.

Plaintiff Helene Sakellis (plaintiff) sued her former employer, Cedars-Sinai Medical Center (Cedars), alleging her termination was motivated by age discrimination and retaliation for raising concerns about patient care and demanding a lunch break. The trial court granted Cedars' summary judgment motion, finding plaintiff was terminated for failing to adhere to policies concerning timekeeping and updating patient charts. We consider whether plaintiff identifies issues of material fact requiring resolution at trial.

## I. BACKGROUND

### A. 2010-2015: Plaintiff Is Regarded as a Highly Skilled Clinician but Receives Some Negative Feedback

In 1992, plaintiff began working for Cedars as a clinical nurse in the labor and delivery unit. Beginning in 2010, and at all times relevant to this appeal, plaintiff worked in Cedars' mother-baby unit (also referred to as the postpartum unit). Plaintiff asked to be transferred to the postpartum unit because, among other things, she wanted to work with the postpartum unit's manager, Anna Greif (Greif), and she believed the postpartum unit would be less stressful than other assignments.[1]

Plaintiff's performance evaluations for the fiscal years ending 2010 through 2015 uniformly praised her skills as a clinician. She was also commended for her bedside manner. One evaluator emphasized plaintiff was "often one of the nurses [the

---

[1] Plaintiff had been in remission from breast cancer since 2005 and it was important to her that she be able to take breaks to drink water and for other purposes, which she was not always able to do in her previous assignment.

2

evaluator] select[ed] for difficult patients or patients where service recovery [was] needed."  Colleagues "sometimes . . . criticized [plaintiff] for spending too much time in the room" with patients, but patients rated her highly.

One area in which plaintiff did not always meet or exceed expectations, however, was promptly documenting the care she provided.  In 2011 and 2012, plaintiff received four "performance counseling" memoranda for instances in which she did not timely update patient charts.[2]  Two of these memoranda indicated plaintiff's delay resulted in inaccurate reporting of the time at which treatment was administered.  Although plaintiff's 2013 performance evaluation stated she demonstrated "much improvement in documenting in real time," her 2014 evaluation indicated that "[a]n opportunity for [plaintiff] would be to always chart in real time—preferably at the bedside and not wait to chart at the end of the shift."

Another recurring theme in plaintiff's performance evaluations between 2010 and 2015 was praise for her strong advocacy for patient care, though tempered by suggestions that she adopt a more diplomatic manner when interacting with

---

[2]      In her contemporaneous responses to these memoranda, plaintiff blamed computer "access problems" in a patient's room, the relevant database locking her out while she was helping a patient use the restroom, and management's failure to bring an oversight to her attention during a period in which she would have been able to correct it.  In later deposition testimony in this case, plaintiff testified the remaining memorandum did not account for the fact that she was physically unable to complete the relevant documentation and was placed on medical leave for carpal tunnel syndrome on the day in question.

colleagues. For example, in 2010, plaintiff's performance evaluation noted she "finds it difficult to deal with people that are not motivated," but emphasized she "has patient satisfaction on the top of her priority list" and was "[n]o doubt . . . a big part of why we are doing so well." In 2011, plaintiff was described as a "stickler about paying attention to detail and reminding nurses when something falls short," and the evaluator encouraged her to find ways to "improv[e] her crucial conversations with the ancillary staff while continuing to raise the bar for excellence without resentment." In 2012, plaintiff's evaluator noted she was "never afraid to report something up the chain of command" and emphasized that interactions with colleagues "could go smoother" and urged "tolerance[ ] and acceptance that everyone is not the same and that it is hard to hear about the error of your ways . . . ." In 2013, the evaluator indicated plaintiff has "a strong voice which she sure knows how to use." In 2014, the evaluator noted "a couple instances" of "behaviors that were unbecoming of a [Cedars] employee" and urged plaintiff to "discuss any type of concerns . . . regarding patients or staff in a private setting and not at the nursing station . . . ." In 2015, the evaluator stated that although plaintiff's "intentions and rationale on an issue or safety concern is often justified, her delivery is not well received . . . ."

Plaintiff reported medical errors in May 2011, June 2011, May 2012, July 2012, and October 2015, as well as violations of patient privacy in November 2010 and September 2015.[3]

---

[3]     Other issues plaintiff raised during her time in the postpartum unit include colleagues moonlighting as private nurses in July 2010; unauthorized changes to nursing assignments in August 2010; concerns about procedures for

4

Responses to plaintiff's concerns fell along a spectrum including silence, Greif telling plaintiff to communicate only with her regarding an alleged medical error, plaintiff being urged to present her concerns to a committee, and receiving a "Safety Star" award.

### B.    2016: Cedars Terminates Plaintiff

Plaintiff was placed on administrative leave in late May 2016 and terminated about a week later.  As we shall discuss, the stated reason for plaintiff's termination was a claimed failure on May 22, 2016, to comply with Cedars' time records policy and previous warnings regarding timely completion of patient charts.  Events occurring the previous day (May 21), however, provide important context for plaintiff's lawsuit.

#### 1.    May 21, 2016: Patient complaint and meal break dispute

On May 21, 2016, plaintiff was assigned to handle the discharge of three newborns, including "difficult" parents of a newborn who had already "fired" (i.e., requested they no longer be attended by) a different nurse.  When the child's father

---

tracking infants' measurements in September 2011; concerns about a colleague's efficiency in October 2011; harassment by another nurse in August 2012; an unelaborated "upsetting situation" in February 2014; a question regarding Cedars' policy as to instructing new parents on car seat use in March 2015; concerns about a policy allowing premature infants to be transferred to the postpartum unit in January 2016; and concerns about waste and proper storage of dirty linens in February 2016.

5

complained the discharge process was taking too long, the charge nurse took over and completed the discharge around 1:30 p.m.[4]

After the three discharges were complete, the charge nurse asked plaintiff to handle another patient's admission to the postpartum unit. Plaintiff said she had been working without a break for six hours and requested coverage while she took her lunch. The charge nurse told plaintiff she was "here to work and if [she did not] want to work she should go home."

Plaintiff responded by calling Wayne Millican (Millican), the hospital administrator on duty, and asked about her right to a meal break under the Labor Code. Millican told plaintiff he would contact the charge nurse. Plaintiff also called the labor and delivery unit and learned the new patient's transfer to the postpartum unit would not proceed until a labor and delivery nurse returned from her lunch break. After plaintiff discussed these two conversations with the charge nurse, she was given permission to take her lunch break.

Millican spoke to the charge nurse and several other postpartum nurses during plaintiff's break. The nurses told Millican plaintiff consistently left for breaks when it was her turn to admit a new patient. The charge nurse reiterated this complaint in an email to Millican.

---

[4]     A few days after the newborn was discharged, Cedars followed up with the child's mother by telephone. Among other things, the mother described plaintiff as "disengaged," stated plaintiff was not listening to her concerns, and said plaintiff was rude to the patient's brother-in-law who sat at plaintiff's work station.

### 2. *May 22, 2016: Plaintiff documents patient care after signing out of her shift*

The following day, plaintiff completed a 12-hour shift and clocked out of Cedars' timekeeping system at 7:57 p.m. The nurse who was taking over the care of plaintiff's patients reminded plaintiff that a patient had a cupcake for her, and plaintiff sat with the patient to eat the cupcake and watch television after she clocked out. Around 10:00 p.m., the nurse who took over for plaintiff noticed that no feedings had been recorded since the morning for the patient with whom plaintiff was sitting. Plaintiff told the nurse she had not yet finished her charting and then—between 10:14 p.m. and 10:29 p.m.— completed the chart entries for care provided earlier in the day. Plaintiff did not clock back in to the timekeeping system when she finished her chart entries for the day.

Cedars' time recording policy states that inaccurate time recording may result in termination. Nonetheless, plaintiff and a former colleague believed it is "common practice" for Cedars nurses to complete patient charts after clocking out. According to plaintiff, every one of the more than 100 nurses she knows completed charts after clocking out because overtime was discouraged. Plaintiff was not aware of anyone else having been disciplined for this practice.

### 3. *Administrative leave and termination*

At a meeting on May 26, 2016, Greif notified plaintiff she was being placed on administrative leave pending an investigation of the patient complaint from May 21, 2016. Greif also remarked that, thanks to plaintiff, breaks would now be

assigned.[5]  Plaintiff complained she was being punished for escalating the meal break dispute to Millican, but Greif "got in [her] face" and said she could not prove that.  Although the written notice placing plaintiff on administrative leave mentioned only the patient complaint and not any concern about plaintiff working "off the clock," Greif told plaintiff she planned to review relevant database entries and if she found plaintiff made even one entry while plaintiff was off the clock, Greif could have her terminated.

The following day, plaintiff sent an email to Cedars' chief nursing executive, Linda Burns Bolton (Burns Bolton), asking whether she was aware plaintiff had been placed on administrative leave.  Burns Bolton was not aware of this, and she asked the acting executive nursing director, Jane Swanson (Swanson), for more information.  Swanson sent Burns Bolton an email stating Greif would be "investigating further," but issues known at the time included the patient complaint from May 21, 2016, and possible timekeeping issues.

About a week later, on June 1, 2016, Greif presented a written separation notice to plaintiff.  The notice cited plaintiff's failure to adhere to Cedars' time records policy and previous warnings regarding accurate recording of work (including the four performance counseling memoranda from 2011 and 2012) as the basis for her termination.  As stated in the notice, the nurse who assumed care for plaintiff's patients after her shift ended on

---

[5]     Here and elsewhere, we state the facts in the light most favorable to plaintiff, as the non-prevailing party on a motion for summary judgment.  (See generally *Gund v. County of Trinity* (2020) 10 Cal.5th 503, 537, fn. 2.)

May 21, 2016, informed management that she "noticed discrepancies and omissions of critical patient information."[6] The subsequent investigation "revealed that although [plaintiff] clocked out at 19:57 [she] continued to work[ ] until 22:29," at which time she recorded "18 occurrences of patient care which should have been documented" earlier.[7]

During the meeting at which Greif told plaintiff she was being terminated, plaintiff asked whether her "social issues were taken into consideration." Plaintiff explained she believed the pertinent issues were that she was 60 years old, lived by herself, supported herself, and was a breast cancer survivor. The

_____

[6]     After a staff meeting on May 23, 2016, the nurse who took over for plaintiff, Marcianne Windbeil, discussed "concerns" about plaintiff with an assistant nurse manager at Cedars, Lauren Flowers (Flowers). On the same day Greif placed plaintiff on administrative leave, Flowers asked Windbeil to send her (Flowers) a statement regarding their earlier discussion and comments plaintiff apparently made about Windbeil's "body art." Windbeil did so that same day—while she herself was not signed in to Cedars' timekeeping system. Windbeil's statement explained plaintiff had given her a report upon taking over and Windbeil reminded her that a patient wanted to give her (plaintiff) a cupcake. While plaintiff was in that patient's room, at about 10:00 p.m., Windbeil noticed records for a baby's feeding had not been updated since 10:00 a.m. According to Windbeil's statement, she asked plaintiff about the missing entries and plaintiff said she was not finished charting yet. When Flowers received Windbeil's emailed statement, she forwarded it to Greif.

[7]     The separation notice is incorrect insofar as it suggests plaintiff was working updating patient charts for the entirety of this two-and-a-half hour period. The record indicates the chart updating took place for 15 minutes.

9

appellate record does not indicate how Greif responded. When plaintiff subsequently asked for "backup documentation" regarding the after-hours charting incident discussed in her separation notice, however, Greif remarked that "health care is getting quite complicated, and sometimes it's difficult for us older nurses to keep up." This was the first and only instance in which Greif made what plaintiff construed as a derogatory remark concerning her age.

### C.     Plaintiff's Lawsuit

Plaintiff sued Cedars for retaliation in violation of pertinent Labor Code and Health and Safety Code statutes; discrimination and failure to prevent discrimination under the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940 et seq.); wrongful termination in violation of public policy; defamation; and declaratory relief.[8]

Cedars moved for summary judgment or, in the alternative, summary adjudication of various issues including the availability of punitive damages. In addition to opposing summary judgment on the facts, plaintiff objected that the numbering of issues in the notice of motion for summary judgment did not match the numbering of issues in the separate statement of undisputed

---

[8]     Plaintiff sued both Cedars and Greif for defamation. As we shall discuss, the trial court granted Cedars and Greif's motion for summary judgment. Because plaintiff does not appeal the trial court's ruling as to the defamation claim, Greif is not a party to this appeal. Plaintiff also does not challenge on appeal the trial court's rulings on her claims for disability discrimination and retaliation under Labor Code section 6310.

10

facts. When Cedars filed a revised notice, plaintiff objected it was not filed at least 75 days before the hearing.

The trial court overruled plaintiff's objections and granted the motion for summary judgment. As to plaintiff's retaliation claims, the trial court found plaintiff failed to make a prima facie case that she was fired for raising concerns about patient safety or a meal break because she did not do so in a whistleblowing context and, in any case, there was no evidence of a causal link between these communications and plaintiff's termination. Similarly, plaintiff failed to make a prima facie case of discrimination based on her age or status as a cancer survivor. In addition, the trial court reasoned that even if plaintiff could make a prima facie case of retaliation or discrimination, Cedars established legitimate reasons for plaintiff's termination—the timekeeping and charting issues—and plaintiff had no adequate evidence these reasons were pretextual.

## II. DISCUSSION

The trial court correctly concluded plaintiff did not raise a material factual dispute concerning age discrimination or retaliation based on patient advocacy, but there is a triable issue of fact as to whether plaintiff was terminated for demanding a lunch break. The lunch break dispute occurred just days before plaintiff was placed on administrative leave and apparently resulted in a policy change within the postpartum unit. Plaintiff's violation of Cedars' timekeeping and charting policies would be a non-retaliatory basis for her termination, but a reasonable jury could find this was a common practice for which she was singled out following the lunch break dispute—and in retaliation therefor. We shall therefore reverse the grant of

11

summary judgment and remand solely for further proceedings on the Labor Code lunch break retaliation claims.[9]

### A. Plaintiff's Procedural Objection Does Not Warrant Reversal

Before reaching the key issues, we address plaintiff's argument that Cedars did not provide adequate notice of its motion. When a party moves for summary adjudication in addition to summary judgment, "the specific cause of action, affirmative defense, claims for damages, or issues of duty must be stated specifically in the notice of motion and be repeated, verbatim, in the separate statement of undisputed material facts." (Cal. Rules of Court, rule 3.1350(b).) Plaintiff objected to Cedars' original notice of motion and separate statement of undisputed material facts on the grounds that the issues were listed in a different order and therefore not repeated "verbatim."[10]

Cedars responded by filing a revised notice of motion a few days before the hearing in which the numbering of the issues for adjudication matched the numbering in the separate statement.

---

[9] Though we conclude the trial court did not err in summarily adjudicating plaintiff's patient-advocacy-predicated retaliation claims, we express no view on whether plaintiff's patient advocacy, and the reactions of others at Cedars to it, would be admissible at trial as context a factfinder should be aware of in deciding the lunch break retaliation claim.

[10] Cedars maintains "all issues for adjudication were included in the notice of motion and were stated *identically* to the issues set forth in the Separate Statement." (Emphasis added.) As we shall discuss, we agree with the trial court's assessment that plaintiff was not prejudiced by any discrepancies.

12

Plaintiff objected that the revised notice of motion failed to comply with Code of Civil Procedure section 437c, which provides that "[n]otice of the motion and supporting papers shall be served on all other parties to the action at least 75 days before the time appointed for hearing." (Code Civ. Proc., § 437c, subd. (a)(2).)

Plaintiff correctly observes that the language of Code of Civil Procedure section 437c, subdivision (a)(2) is mandatory and does not permit the trial court to shorten the notice period. The point is irrelevant, however, because the trial court properly exercised its discretion to overrule the objection to the formatting error in the original notice. "[T]he court's power to deny summary judgment on the basis of failure to comply with California Rules of Court, rule 3.1350 is discretionary, not mandatory." (*Truong v. Glasser* (2009) 181 Cal.App.4th 102, 118.) Here, the discrepancy between the original notice of motion and the separate statement demonstrably did not hinder plaintiff's ability to respond. (*Ibid.* [trial court did not abuse its discretion in overruling objection where "[t]he facts critical to the ruling were adequately identified, and [the plaintiffs] ha[d] not explained how any alleged deficiency in [the defendant's] separate statement of material facts impaired [the plaintiffs'] ability to marshal evidence to show that material facts were in dispute"].)

### B.  Summary Judgment Law

"'"A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); [citation].) The moving party bears the burden of showing the court that the plaintiff "'has not established, and

13

cannot reasonably expect to establish,'" the elements of his or her cause of action.  [Citation.]"'" (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 705.)

Because direct evidence of intentional discrimination or retaliation is rare and such claims must usually be proved circumstantially, California courts analyze such claims by applying the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*). (*Choochagi v. Barracuda Networks, Inc.* (2020) 60 Cal.App.5th 444, 457 (*Choochagi*); *Arnold v. Dignity Health* (2020) 53 Cal.App.5th 412, 423 (*Arnold*).)  "The *McDonnell Douglas* framework is modified in the summary judgment context." (*Serri v. Santa Clara Univ.* (2014) 226 Cal.App.4th 830, 861.)  "In the summary judgment context, '"the employer, as the moving party, has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory [or nonretaliatory] factors.'" [Citation.]  If the employer meets this initial burden, the plaintiff must "demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with discriminatory [or retaliatory] animus, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination [or retaliation] or other unlawful action.'" [Citation.]" (*Choochagi*, *supra*, 60 Cal.App.5th at 457.)

14

## C. *Summary Adjudication of the Retaliation Based on Patient Advocacy Retaliation Claims Was Proper*

Plaintiff claims she was fired in retaliation for raising concerns about patient safety and privacy in violation of Labor Code section 1102.5[11] and Health and Safety Code section 1278.5.

Health and Safety Code section 1278.5 is intended "to encourage patients, nurses, members of the medical staff, and other health care workers to notify government entities of suspected unsafe patient care and conditions" (§ 1278.5, subd. (a)) and prohibits health care facilities from retaliating "in any manner" against persons who have, among other things, "[p]resented a grievance, complaint, or report to the facility" (Health & Saf. Code, § 1278.5, subd. (b)(1)(A)). More broadly, section 1102.5 prohibits any employer from retaliating against an employee who discloses a violation of a state or federal law or regulation "to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance . . . ." (§ 1102.5, subd. (b).) A prima facie case of retaliation under both Health and Safety Code section 1278.5 and section 1102.5 requires a showing of a causal link between protected activity and adverse employment action. (*Armin v. Riverside Community Hospital* (2016) 5 Cal.App.5th 810, 830.)

Assuming without deciding that each of plaintiff's communications concerning patient safety and privacy qualifies as protected activity, the temporal proximity between plaintiff's communications and her termination, though somewhat

---

[11] Undesignated statutory references that follow are to the Labor Code.

15

attenuated, would be sufficient to establish a prima facie case of retaliation. (§ 1278.5, subd. (d)(1) [rebuttable presumption of discrimination when, among other things, adverse employment action is taken "within 120 days of the filing of the grievance or complaint by the employee"].) Case law may permit such an inference based on even older communications. (*Hawkins v. City of Los Angeles* (2019) 40 Cal.App.5th 384, 394 [gaps of six months for one employee and 16 months for another between protected activity and termination established causal link for purposes of prima facie case of retaliation]; but see *Le Mere v. Los Angeles Unified School Dist.* (2019) 35 Cal.App.5th 237, 243 (*Le Mere*) ["[s]everal federal cases hold that intervals of more than a few months were too long to support causation"].)

Plaintiff's violation of Cedars' timekeeping and charting policies, however, is a legitimate, non-retaliatory basis for her termination. (See generally *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 358 ["'legitimate' reasons [citation] in this context are reasons that are *facially unrelated to prohibited bias*"].) The question then becomes whether there is evidence of pretext foreclosing summary adjudication. There is not.

*Guz, supra*, 24 Cal.4th 317 explains that evidence an employer "lied about its reasons" for adverse employment action does not automatically preclude summary judgment for the employer in an age discrimination case. (*Id.* at 360-361 ["The pertinent statutes do not prohibit lying, they prohibit discrimination"].) Even if it is true that plaintiff's termination was not prompted by the timekeeping and charting violations (a point we will return to later), there is no substantial evidence that would permit a jury to find she was fired specifically in retaliation for her patient advocacy. (*King v. United Parcel*

16

*Service, Inc.* (2007) 152 Cal.App.4th 426, 433 (*King*); *Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163 ["the plaintiff must produce substantial responsive evidence sufficient to establish a triable issue of material fact on the merits of the defendant's showing"].)

Plaintiff's performance evaluations repeatedly urged her to take a more constructive approach when criticizing colleagues to avoid "resentment" and "push back," but management unambiguously appreciated her advocacy—believing it was "often justified" and "a big part of why we are doing so well." She was thanked and even officially recognized for raising patient safety and privacy concerns. Even less effusive responses, such as an October 2015 email in which Greif asked plaintiff to forward all correspondence regarding an alleged medical error to her, made clear that plaintiff's patient advocacy was welcome: Greif indicated she would schedule a follow-up meeting in the same email. We acknowledge the possibility that an employer may criticize the manner or tone in which an employee raises issues in order to chill such activity altogether, but there is no evidence that this occurred here.[12]

Other evidence plaintiff cites in an attempt to show that an inference of retaliation based on patient advocacy could be drawn is also insufficient. Cedars' human resources department

---

[12]  Casual remarks suggesting plaintiff was difficult to manage—e.g., an evaluator thanking plaintiff "for making me laugh, making me crazy[,] and most of all for helping us raise our . . . 'patient satisfaction and would recommend scores'"—cannot be interpreted on this record as discouraging plaintiff's patient advocacy.

17

prepared a draft "final" performance counseling memorandum[13] from Greif to plaintiff in November 2014 that Greif did not recognize and that was not presented to plaintiff, but this is not probative of Cedars' motives in 2016. Similarly, cited incidents in 2010 when an assistant nurse manager wrongly accused plaintiff of failing to administer a prescribed medication and wrote her up for providing paper nail files to new mothers (which plaintiff maintains is an accepted practice) are not probative of the reasons for her termination in 2016. Plaintiff's contention that Greif and another nurse "looked for ways to discipline her" after she reported a privacy issue in September 2015 is predicated solely on a foundation-less, uncorroborated statement in plaintiff's declaration describing how plaintiff learned of the asserted vendetta. (See, e.g., *King, supra*, 152 Cal.App.4th at 433 ["plaintiff's subjective beliefs in an employment discrimination case do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations"].) And plaintiff's suggestion that it was improper for Cedars to evaluate her patient care in 2014 and 2015 based on a review of medical charts as opposed to direct observation reveals nothing of Cedars' motives, at least without more information about how other nurses were evaluated in these years—particularly when the evaluators determined plaintiff did meet performance requirements.

---

[13]   The appellate record does not disclose the substance of the draft memorandum.

### D. Summary Adjudication of the Age Discrimination Claim was Proper

FEHA prohibits discriminatory employment practices, including the discharge of an employee based on age (Gov. Code, § 12940, subd. (a)) and the failure to take all reasonable steps to prevent such discrimination from occurring (Gov. Code, § 12940, subd. (k)). Generally, a prima facie case of age discrimination requires a showing that the plaintiff was 40 years of age or older and performing competently when an adverse employment action was taken, plus "some other circumstance suggest[ing] discriminatory motive." (*Guz*, *supra*, 24 Cal.4th at 355.) Other circumstances suggesting a discriminatory motive may include, for example, replacement by a significantly younger person. (*Arnold*, *supra*, 53 Cal.App.5th at 424.)

Here, the only evidence suggesting a discriminatory motive for plaintiff's firing was Greif's comment that "health care is getting quite complicated, and sometimes it's difficult for us older nurses to keep up." In assessing the probative value of such statements, we must consider "who made the comments, when they were made in relation to the adverse employment decision, and in what context they were made . . . ." (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 541 (*Reid*).)

Greif recommended plaintiff's termination and made the remark during the meeting at which she informed plaintiff she was being terminated. Greif had not previously commented on plaintiff's age in the six years they worked together, however, and it was plaintiff who first broached "social issues," including her age, as a reason not to fire her. Greif only referred to plaintiff's age when plaintiff pressed for "backup documentation" regarding the after-hours charting incident discussed in her

19

separation notice.  In context, the only reasonable interpretation of Greif's comment is as a misplaced attempt to soften the proffered reason for plaintiff's firing by emphasizing that it had nothing to do with plaintiff's unimpeachable clinical skills.  These circumstances cannot reasonably give rise to an inference of age discrimination.

Plaintiff protests that Greif's comment constitutes direct evidence of age discrimination and no other proof is required, but the comment is at best a stray remark.  (*Reid, supra,* 50 Cal.4th at 541 ["A stray remark *alone* may not create a triable issue of age discrimination"], italics added.)  For reasons just described, the comment is not reasonably understood as reflecting discriminatory animus, particularly when it came only after plaintiff's termination was already a fait accompli and that termination decision was approved by others at Cedars for whom there is no evidence of intent to discriminate on the basis of age (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 550 ["There must . . . be evidence of a causal relationship between the animus and the adverse employment action . . ."]).

Because there is no triable issue as to plaintiff's age discrimination claim, there is no triable issue as to her derivative claim for failure to prevent discrimination under Government Code section 12940, subdivision (k).  (See *Dickson v. Burke Williams, Inc.* (2015) 234 Cal.App.4th 1307, 1318 ["There cannot be a claim for failure to take reasonable steps necessary to prevent sex discrimination under [Government Code] section 12940, subdivision (k) if actionable sex discrimination has not

been found"].) There is also no triable issue as to her derivative claim for wrongful termination in violation of public policy.[14]

>    E.    *Summary Adjudication of the Lunch Break*
>          *Retaliation Claims, on the Other Hand, Was Error*

Section 512, subdivision (a) provides, subject to exceptions not applicable here, that "[a]n employer shall not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes." (§ 512, subd. (a).) Plaintiff alleges Cedars fired her in retaliation for escalating a dispute regarding her right to a lunch break in violation of sections 98.6 and 1102.5. Section 98.6 prohibits retaliation against an employee "because of the exercise . . . of any rights afforded him or her." (§ 98.6, subd. (a).) As pertinent here, section 1102.5 prohibits retaliation against an employee who discloses a violation of a state or federal law or regulation "to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance . . . ." (§ 1102.5, subd. (b).)

---

[14]    Both plaintiff and Cedars suggest plaintiff's cause of action for wrongful termination in violation of public policy derives generally from her retaliation and discrimination causes of action. It does not. As stated in the operative complaint, plaintiff's claim for wrongful termination in violation of public policy is based on Cedars' alleged violation of the "fundamental policy of the State of California that Defendants cannot discriminate and/or retaliate against any employee on the basis of age or medical condition, among other things."

21

To establish a prima facie case of retaliation under sections 98.6 or 1102.5, a plaintiff must demonstrate a causal link between protected activity and adverse employment action. (*St. Myers v. Dignity Health* (2019) 44 Cal.App.5th 301, 314.) Here, plaintiff did so by producing evidence that the charge nurse told her she could not take a lunch break, she called Millican to intervene, her complaint resulted in a change to the postpartum unit's meal break policies, and she was placed on administrative leave less than a week later.

Cedars halfheartedly argues plaintiff's call to Millican was not protected activity because she was ultimately permitted to take a lunch break. Relatedly, the trial court also believed plaintiff had not made a prima face case of Labor Code retaliation because her communications with Millican and Greif were "routine" workplace communications. Neither point is correct.

As to the first point (the argument plaintiff was ultimately permitted to take a break), section 98.6 prohibits retaliation against an employee for *exercising* their rights—not for enduring a violation of their rights. (§ 98.6, subd. (a).) Similarly, section 1102.5 prohibits retaliation against an employee who reports a violation to a person with authority to correct it—regardless of whether the latter does so. (§ 1102.5, subd. (b).) From a practical standpoint, the notion that an employee who wins a concession from their employer cannot, by definition, be subject to unlawful retaliation would render anti-retaliation statutes toothless against any employer capable of basic strategy.

The temporal proximity between plaintiff's call to Millican and her administrative leave (less than a week later) and termination (less than two weeks later) is alone sufficient to establish the requisite causal relationship for purposes of

plaintiff's prima facie case.[15] (*Le Mere, supra,* 35 Cal.App.5th at 243 ["Notwithstanding the absence of direct evidence of retaliatory animus, close temporal proximity between a plaintiff's protected activity and the alleged retaliatory conduct against the plaintiff has been found sufficient to support a prima facie case of causation"]; but see *id.* at 243 ["A gap of two years is not sufficient as a matter of law to support an inference of causation"].)

As to the second point (whether plaintiff's call was "routine"), the circumstances of plaintiff's call to Millican are entirely different than a school principal's disclosure of student complaints regarding teachers to district administrators in *Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, which the Court of Appeal described as "routine" and held to be unprotected activity. (*Id.* at 1385.) The routine manner in which plaintiff requested a lunch break was to speak with the charge nurse. Her call to Millican was a deviation from this norm that she understood to be warranted because the charge nurse told her she could not take the meal break to which she was entitled under section 512. Millican's response resulted in plaintiff being allowed to take her meal break and a change to the postpartum unit's meal break policies. Cedars' contention that calling the administrator on duty "was the normal procedure *when there was a dispute*" (emphasis added) rests on the premise that any workplace complaint raised through prescribed channels

---

[15] The authority the trial court relied on to reach a contrary conclusion discusses the sufficiency of temporal proximity to establish pretext at the third stage of the *McDonnell Douglas* analysis. (*Diego v. Pilgrim United Church of Christ* (2014) 231 Cal.App.4th 913, 932 (*Diego*).)

cannot qualify as protected activity.  That is not the law.  (See, e.g., *Glynn v. Superior Court* (2019) 42 Cal.App.5th 47, 55-56 [holding that a plaintiff's emails to his employer's human resources department constituted protected activity for purposes of FEHA retaliation claim].)

Plaintiff therefore made out a prima facie case of section 98.6 and section 1102.5 retaliation, and there is also evidence revealing a triable issue of material fact as to whether Cedars' proffered timekeeping and patient charting reasons were mere pretext for Labor Code-prohibited retaliation.  Specifically, while the temporal proximity between the call to Millican and plaintiff's firing is not alone sufficient to raise a triable issue as to pretext (*Diego*, *supra*, 231 Cal.App.4th at 932), it is sufficient when combined with other evidence in the record.

Plaintiff and a former colleague both stated it was a common practice among Cedars nurses—indeed, according to plaintiff, a pervasive practice—to complete patient charts after clocking out, and Cedars produced no evidence of others having been disciplined.[16]  This is evidence a jury could rely on to find Cedars' proffered reason for firing plaintiff pretextual. (*Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 817 ["evidence that [an employee] was treated differently from others who were similarly situated" supports finding of pretext].)  The shifting reasons for disciplinary action against plaintiff over the course of one week further support an inference of pretext.  (See,

---

[16]     As additional evidence of Cedars' failure to insist that all work activities be performed while "on the clock," plaintiff also highlights Windbeil's compliance with Flowers's request for a written statement regarding plaintiff while "off the clock"— without any disciplinary repercussions.

24

e.g., *Guz, supra*, 24 Cal.4th at 363 ["in an appropriate case, an inference of dissembling may arise where the employer has given *shifting*, contradictory, implausible, uninformed, or factually baseless justifications for its actions"], italics added.) Greif's remark that she planned to review plaintiff's time records when she first placed plaintiff on administrative leave suggests she was seeking a stronger reason to discipline her.[17] In addition, Greif's comment "thanking" plaintiff for prompting a change in meal break policy (which, construed in the light most favorable to plaintiff, was sarcastic) supports an inference that Greif and others in the postpartum unit were embarrassed or annoyed by plaintiff's call to Millican and the changes it prompted—and retaliated against her because of it.

### F. Punitive Damages

Cedars also sought summary adjudication of whether plaintiff was potentially entitled to punitive damages. Because the trial court granted summary judgment, it did not rule on this request for summary adjudication. Plaintiff asks us to hold in context of this appeal that there is a triable issue as to whether she is entitled to punitive damages. We decline. The trial court is well equipped to address in the first instance whether there is evidence of malice, fraud, or oppression, that satisfies the higher clear and convincing standard of proof (and any other associated issues). (*Szarowicz v. Birenbaum* (2020) 58 Cal.App.5th 146, 171

---

[17] The lack of evidence that Cedars disciplined (or even solicited patient feedback regarding) the other nurse with whom the difficult patient clashed supports the inference that the basis for plaintiff's administrative leave was itself pretext.

25

[“The standard for a motion for summary adjudication on a claim for punitive damages is whether clear and convincing evidence exists to support that claim”].)

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with directions to vacate the order granting summary judgment and enter a new summary adjudication order consistent with the views expressed in this opinion.  The parties shall bear their own costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:



RUBIN, P. J.



MOOR, J.


26